IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.  08-cv-01693-MSK-KLM

CHRISTINA ANN FOURHORN,
MUSE JAMA,
JOSE ERNESTO IBARRA,
DENNIS MICHAEL SMITH,
SAMUEL POWELL MOORE, and
DEDE DAVIS,

     Plaintiffs,

ANTONIO CARLOS SANCHEZ,

     Plaintiff-Intervenor,

v.

CITY AND COUNTY OF DENVER,
MARK DALVIT, a detective with the Denver Police Department, in his individual capacity,
CURT PETERSON, an officer with the Denver Police Department, in his individual capacity,
JOHN BISHOP, an officer with the Denver Police Department, in his individual capacity,
ALAN SIRHAL, a Denver Sheriff Department deputy, in his individual capacity,
CHOICE JOHNSON, an officer with the Denver Police Department, in his individual capacity,
ANDREW RICHMOND, an officer with the Denver Police Department, in his individual capacity,
PAUL ORTEGA, a sergeant with the Denver Sheriff Department, in his individual capacity,
JOHN DOE 1, a Denver Police Department officer, whose identity is unknown, in his individual capacity, and
JOHN DOE 2, a Denver Police Department officer, whose identity is unknown, in his individual capacity,

     Defendants.

_____

## ORDER
_____

**ENTERED BY MAGISTRATE JUDGE KRISTEN L. MIX**

     This matter is before the Court on **Plaintiffs' and Intervenor's Motion to Compel**

**Production of Certain Documents Listed in Denver's Privilege Logs** [Docket No. 192;

Filed June 11, 2009] (the "Motion"). Defendant City and County of Denver (hereinafter, "Defendant Denver" or "City") filed a Response in opposition to the Motion on July 6, 2009 [Docket No. 226], and Plaintiffs and Intervenor (hereinafter, "Plaintiffs") filed a Reply on July 24, 2009 [Docket No. 240]. The Motion has been fully briefed and is ripe for resolution.

IT IS HEREBY **ORDERED** that the Motion is **GRANTED** for the reasons set forth below.

This case involves the alleged wrongful arrests of Plaintiffs based upon mistaken identity. Plaintiffs contend that alleged "recklessly sloppy police work" led to their arrests at different times for unrelated offenses and in each case, Defendants "were aware of facts that demonstrated that they were arresting or causing the arrest of the wrong person, but they deliberately ignored those facts." *Complaint* [#221] at 5. Further, Plaintiffs contend that Defendant Denver was aware of the risks associated with mistaken identity arrests but failed to adopt policies, or had policies in place, which contributed to those risks. *Id.* at 63-77. Plaintiffs assert state law claims as well as federal constitutional claims pursuant to 42 U.S.C. § 1983, including whether Defendant Denver's current policies, or failure to enact preventative policies, directly led to the mistaken identity arrests and caused the deprivation of constitutional rights.

The discovery dispute at issue here deals with Defendant Denver's refusal to produce between eighteen and twenty-five documents requested by Plaintiff pursuant to the deliberative process privilege. *Compare Motion* [#192] at 3-5, *with Response* [#226] at 2. The privilege, also known as the governmental, executive or official information privilege, protects "advisory opinions, recommendations and deliberations used by the government in making decisions and policies. The information must be predecisional and deliberative."

*Olmsted v. McNutt*, 188 F.R.D. 386, 388 (D. Colo. 1999); *In re Sealed Case*, 121 F.3d 729, 737 (D.C. Cir. 1997) (noting that the purpose of the privilege is to "'prevent injury to the quality of agency decisions' by allowing government officials freedom to debate alternative approaches in private" (citation omitted)). "The deliberative process privilege does not shield documents that simply state or explain a decision . . . or protect material that is purely factual, unless the material is so inextricably intertwined with the deliberative sections of documents that its disclosure would inevitably reveal the government's deliberations." *Sealed Case*, 121 F.3d at 737. The privilege is meant to protect documents which contain discussions regarding proposed polices to avoid confusing the public by releasing "reasons and rationale that were not in fact ultimately grounds for an agency's actions." *SEC v. Nacchio*, 05-cv-00480-MSK-CBS, 2009 WL 211511, at *6 (D. Colo. Jan. 29, 2009) (unpublished decision).

The deliberative process privilege is a qualified privilege, meaning that it is not absolute, and even though it may apply to a document, the privilege "may be overcome by showing a need by the Plaintiff as an overriding public interest." *McNutt*, 188 F.R.D. at 388. The need determination is made on a case-by-case basis, "taking into account factors such as 'the relevance of the evidence,' 'the availability of other evidence,' 'the seriousness of litigation,' 'the role of government,' and the 'possibility of future timidity by government employees.'" *Sealed Case*, 121 F.3d at 737-38. Where disclosure may shed light on government misconduct, the privilege generally must yield as it is only meant to protect government deliberations that promote the public's interest in honest governmental action. *Id.*

In this Court, when federal law governs the rule of decision, federal common law, as

opposed to state law, governs the existence of privileges.  *See Cutting v. United States*, No. 07-cv-02053-REB-MEH, 2008 WL 1775278, at *2 (D. Colo. Apr. 14, 2008) (unpublished decision).  Although this case involves both federal and state claims, the claims dealing with this dispute were brought pursuant to 42 U.S.C. § 1983 and, therefore, federal common law governs whether the documents are privileged.  *See, e.g.*, *Everitt v. Brezzel*, 750 F. Supp. 1063, 1066 (D. Colo. 1990); *Hutton v. City of Martinez*, 219 F.R.D. 164, 167 (N.D. Cal. 2003); *see also* Fed. R. Evid. 501 committee note ("[T]he Federal law of privileges should be applied with respect to pendent State law claims when they arise in a Federal question case."); *Hancock v. Hobbs*, 967 F.2d 462, 467 (11th Cir. 1992) ("We therefore hold that the federal law of privilege [applies in a federal question case], even if the [discovery] is relevant to a pendent state law count which may be controlled by a contrary state law of privilege."); *Wm. T. Thompson Co. v. Gen'l Nutrition Corp.*, 671 F.2d 100, 104 (3d Cir. 1982) (noting that when privilege issue overlaps with federal and pendent state law claims, federal rule in favor of admissibility controls).

As a preliminary matter, to the extent that Defendant Denver contends that local city ordinances create a deliberative process privilege that is applicable to the documents at issue, see *Response* [#226] at 5-6 (citing Denver Municipal Code §§ 2-371(b) & 2-376(c)), the argument is rejected.  The prevailing concern here is whether federal common law supports the application of the privilege to the documents and, if so, whether such privilege must yield to disclosure due to a compelling need.  *See generally Smith v. Losee*, 485 F.2d 334, 341 (10th Cir. 1973) ("[T]he federally created cause of action cannot be restricted by state laws or rules relating to sovereign immunity nor to official privilege."); *United States v. Phoenix Unition High Sch. Dist.*, 681 F.2d 1235, 1237-38 (9th Cir. 1982) (noting that despite

state confidentiality law to the contrary, documents sought in federal case to determine whether civil rights law was violated must be disclosed).

Plaintiffs argue that Defendant Denver should be compelled to produce documents prepared by the City's internal affairs bureau which were created during the bureau's investigations into the mistaken identity arrests of Plaintiffs. *Motion* [#192] at 3. Specifically, Plaintiffs contend that because they "have alleged police misconduct brought about by Denver's policies or its deliberate indifference to adopt[ing] policies preventing such misconduct[,] . . . Denver may not shield its policies or its policymaking from discovery by asserting the deliberative process privilege." *Id.* at 6. Moreover, Plaintiff's argue that allowing the privilege to shield discovery would prohibit the legal inquiry into whether Defendants violated Plaintiff's civil rights. *Id.* at 7 (citing *Hinsdale v. City of Liberal*, No. 96-1249-FGT, 1997 WL 557314, at *1 (D. Kan. Aug. 27, 1997) (unpublished decision)). In other words, applying the privilege would undercut Congress' intention in enacting 42 U.S.C. § 1983 of providing a vehicle to litigants to "deliberately expose[] government decisionmaking to the light." *Id.* at 8-10 (quoting *In re Subpoena Duces Tecum*, 145 F.3d 1422, 1424 (D.C. Cir. 1998)).

Defendant Denver counters that "[i]n the present action, decision-making within the law enforcement disciplinary process is not the subject of the litigation." *Response* [#226] at 6. Further, it argues that "any minimal need for intermediate recommendations about discipline is outweighed by the purpose of the [privilege]." *Id.* Finally, it argues that while it produced "hundreds of pages of internal affairs files," it only claimed the privilege "when the deliberative process [was] at risk," such as when the document contained "pre-decisional non-final recommendations, and input provided by the Denver Independent Monitor's Office

5

as part of the deliberative internal affairs process." *Id.* at 2, 7.

In their Reply, Plaintiffs argue that "the training and supervision/discipline of police officers with respect to mistaken-identity arrests necessarily encompass internal affairs deliberations and decisions, since they bear directly on the application of formal or *de facto* policies, and the supervision, training and discipline of police officers." *Reply* [#240] at 4. Plaintiffs contend that the documents at issue are relevant to their municipal liability claims and may support their argument that Defendant Denver provided "constitutionally inadequate training and supervision" or that their policies, or lack thereof, violated Plaintiff's civil rights. *Id.* at 6.

"To properly claim the privilege, an agency is not required to demonstrate a specific final decision, but simply establish what deliberative process was involved and the role played by the contested evidence in the course of that process." *Nacchio*, 2009 WL 211511 at *6. Here, the process at issue was Defendant Denver's internal investigations of the mistaken identity arrests of Plaintiffs. However, nowhere in the privilege log or Defendant Denver's Response is there mention of the role the documents at issue here played in the internal affairs decision-making process. While the Response is heavy on presentation of the purpose and scope of the privilege, it is limited on analysis of why the subject documents bear protection as opposed to the several hundred other similar documents already produced by Defendant Denver. Although Defendant Denver invites me to make an in camera inspection to ascertain for myself whether the privilege applies, I decline to do so because I find that even if applicable, Plaintiffs have demonstrated a compelling need for the documents which overrides the privilege. Further, any alleged harm or confusion to the public that could be created by production can be minimized, if not avoided completely, by

producing these documents to Plaintiffs pursuant to the Protective Order [Docket No. 34].

The Court considers several factors denoted as instructive for determining whether the qualified deliberative process privilege should be pierced. *See Sealed Case*, 121 F.3d at 737-38 (noting relevance, seriousness of litigation and fear of future timidity as important considerations, among others). As a preliminary matter, because the City is a Defendant in this case, "its role typically weighs in favor of disclosure of the requested document . . . ." *See Moreland Props., LLC v. City of Thornton*, No. 07-cv-00716-EWN-MEH, 2007 WL 2523385, at *5 (D. Colo. Aug. 31, 2007) (unpublished decision).

Next, to defeat any notion that there is a prevailing need for the documents, Defendant Denver makes a broad relevance argument that the case has nothing to do with policy making, and is instead merely about the arrests of Plaintiffs. I reject this argument. Defendant Denver's alleged policies, failure to enact policies and failure to properly supervise and train are material issues in this litigation. Arguably, the allegations suggest misconduct or gross oversight by City officials or, at a minimum, deliberate indifference. Discussions, analyses and recommendations about how to handle the mistaken identity arrests, the seriousness attributed to such occurrences by City officials, and whether discussions were held about current polices as a sufficient mechanism to deter future arrests or whether new policies were contemplated and rejected are relevant to the issue of Defendant Denver's liability, if any. I note that a review of the privilege log reveals that many of the documents at issue were created after certain Plaintiffs' arrests. While these documents may not speak to pertinent issues related to Plaintiffs' state law tort claims, they may nevertheless demonstrate Defendant Denver's knowledge of failed policies or its neglect in enacting new policies. These documents may also evidence whether Defendant

Denver (1) had knowledge that additional police officer training or supervision was necessary to prevent future mistaken identity arrests but (2) was unresponsive to this need. Any and all of this information arguably speaks to the issue of municipal liability. *See generally Barney v. Pulsipher*, 143 F.3d 1299, 1307-08 (10th Cir. 1998) ("The deliberate indifference standard may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm."); *see also Oviatt v. Pearce*, 954 F.2d 1470, 1477 (9th Cir. 1992) (holding that custom of inaction could establish municipal liability).

Further, given the apparent frequency with which mistaken-identity arrests occurred and the alleged collateral harm caused by the arrests, the issue is one of great importance in assuring the public that innocent citizens are not being unlawfully and unnecessarily detained by police. While disclosure of the internal affairs documents at issue may marginally contribute to timidity in future handling of investigations, disclosure may also have the opposite effect here. Specifically, it may caution City officials to take similar issues seriously and to conduct investigations and adopt policies calculated to correct and minimize future mistakes.

On balance, I find that the deliberative process privilege must yield here to Plaintiffs' need for documents that may potentially speak to a material issue in their case. *See In re Subpoena*, 145 F.3d at 1424; *see also Hinsdale*, 1997 WL 557314, at *1 (noting that "Courts have consistently found that the privilege is outweighed by the interest in disclosure where a case is based on alleged violations of federally-protected civil rights"). Accordingly,

IT IS FURTHER **ORDERED** that Defendants shall produce any previously

undisclosed documents relating to this dispute on or before **August 10, 2009**. The documents produced pursuant to this Order shall be deemed confidential and subject to the requirements set forth in the Protective Order [Docket No. 34].[1]

Dated: August 3, 2009

                                        BY THE COURT:

                                        s/ Kristen L. Mix
                                        Kristen L. Mix
                                        United States Magistrate Judge

---

[1] Allowing production of these documents pursuant to the Protective Order should not be construed as determinative of any issue currently pending regarding Defendants' confidentiality designations of other produced documents [Docket Nos. 177 & 241].