IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger

Civil Action No. 08-cv-01693-MSK-KLM

MUSE JAMA,
JOSE ERNESTO IBARRA, and
DENNIS MICHAEL SMITH,

      Plaintiffs,

ANTONIO CARLOS SANCHEZ,

      Plaintiff-Intervenor,

v.

CITY AND COUNTY OF DENVER,
KURT PETERSON, an officer with the Denver Police Department, in his individual capacity,
JOHN BISHOP, an officer with the Denver Police Department, in his individual capacity, and
ALAN SIRHAL, a Denver Sheriff Department deputy, in his individual capacity,

      Defendants.

---

# ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

---

THIS MATTER comes before the Court on Defendants Kurt Peterson and John Bishop's Motion for Summary Judgment **(#277)**, to which the Plaintiffs responded **(#325)**, and the Defendants replied **(#340)**. Having considered the same, the Court **FINDS** and **CONCLUDES** the following.

## I.   Jurisdiction

This Court exercises subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

## II.   Issue Presented

The Amended Complaint **(#85)** contains a single claim against Defendants Peterson and Bishop (collectively, the "Officers") asserted by Plaintiff Muse Jama pursuant to 42 U.S.C.

§ 1983 for violation of his Fourth Amendment rights. This claim arises from the Defendants' September 21, 2007 arrest and detention of Mr. Jama based on a warrant for an "Ahmed Alia" who used "Muse Jama" as an alias. Mr. Jama contends that his arrest was unreasonable and therefore in violation of the Fourth Amendment for three reasons: (1) the Officers failed to conduct a reasonable investigation prior to the arrest; (2) the mistake as Mr. Jama's identity itself was unreasonable; and (3) after the actual arrest, it was unreasonable for the Officers to fail to investigate Mr. Jama's claim of mistaken identity. In their Motion for Summary Judgment, the Officers assert the defense of qualified immunity.

### III. Material Facts

Considering all undisputed facts, and construing those in dispute most favorably to Mr. Jama for purposes of this motion, the Court finds the material facts to be as follows.

On September 21, 2007, Mr. Jama was arrested by Officers Kurt Peterson and John Bishop of the Denver Police Department pursuant to a warrant issued on August 6, 2007 by the Denver District Court. The warrant directed the arrest of Ahmed Alia for failure to appear before the Denver District Court on August 6, 2007 on charges of auto theft.[1]

The warrant described Mr. Alia as a black male, 5'11", 130 lbs, with brown eyes, black hair, and scars on the upper lip and right arm. It identified Mr. Alia's date of birth as 1/1/1981, his social security number as ending in 6785[2] and his address as 8841 E. Florida, Denver, CO. The warrant also listed six alias names purportedly used by Mr. Alia : (1) Mohamed Mahudu Alia (date of birth of 1/1/1981, a scar on his forehead, and the same social security number); (2)

---

[1] There is no dispute as to the validity of this warrant.

[2] The warrant included full social security numbers. For privacy purposes here, however, the Court shall reference only the last four digits of the listed social security numbers.

2

Adbiqani Ahmed (date of birth of 1/1/1980, a scar on his left elbow, and the same social security number except the final digit identified as 4 instead of 5); (3) Salad Cawin (date of birth of 2/2/1980 and a social security number with terminal digits 7830); (4) Salad Cowil (date of birth of 2/20/1980); (5) Muse Mohamed Jama (date of birth of 1/1/1984); and (6) Yonis Abdi Noor (date of birth of 1/1/1987).

Prior to execution of the warrant, the Federal Bureau of Investigation's ("FBI") computer system generated and sent a letter[3] to the Denver Police Department regarding the warrant. The parties dispute what was in the letter[4] and it has been destroyed. Construing the facts most

---

[3] It is somewhat unclear why the letter was generated and sent, but it appears that, based on information entered into a national database, the FBI computer will automatically send information to local authorities regarding individuals with outstanding warrants. The letter has been destroyed, and is not before the Court. The parties dispute its characterization (a "tip sheet/investigative lead" or "computer generated letter"), but the label is irrelevant. For ease of reference but without attaching any significance to the label, the Court shall refer to this communication as "the FBI Letter".

[4] Officer Peterson testified that it contained the warrant number, Mr. Alia's social security number, various dates of birth used by Mr. Alia, and Mr. Alia's aliases, including Muse Jama, and that Mr. Alia was living in Denver at 1265 S. Bellaire Street, #206, under the name of Muse Jama. Mr. Jama contests this characterization, relying upon an unsworn summary of the letter's contents by FBI Supervisory Special Agent Joseph T. Airey based on his conversation with another FBI Agent, Jo Ann Moore. This summary identifies the information supplied in the FBI Letter to be the warrant number, identification of Mr. Alia's date of birth as 1/1/81, his social security number with terminal digits 6785 and that he might be located at 1251 S. Bellaire St. The summary, however, does not preclude the possibility that additional information was provided. Mr. Jama contends that the disagreement between Officer Peterson's recollection and the summary creates a genuine issue of material fact. The Officers object to the Court's consideration of the letter as inadmissible hearsay lacking appropriate authentication.

The Officers are quite right that Special Agent Airey's statement does not constitute competent evidence of the contents of the FBI Letter sufficient to create a genuine factual dispute. *See Serna v. Colo. Dep't of Corr.*, 455 F.3d 1146, 1151 (10th Cir. 2006). However, even if the evidence was competent, the Court cannot conclude that a genuine dispute of material fact relative to the determination of this motion exists. A summary is just that - it does not purport to identify all information provided or preclude the possibility that other information was provided. Thus, there may be no genuine dispute as to what the FBI Letter stated. Even if there is a genuine dispute as to the contents of the FBI Letter, they do not constitute a fact material to the qualified immunity analysis.

3

favorably to Mr. Jama, the Court will assume that the letter included the warrant number, Mr. Alia's date of birth as 1/1/81, his social security number with the last four digits being 6785, and that he might be located 1251 S. Bellaire, but makes no determination as to whether it contained additional information.

To verify the accuracy of this information, Officer Peterson contacted the National Crime Information Center ("NCIC") Operator, who verified the validity of the warrant and performed a computer search for Mr. Alia's name in the NCIC database, the Colorado Crime Information Center ("CCIC") database, and the Denver warrant database. He also searched the QDA database, which includes data from Colorado driver's licenses and identification cards addresses associated with the names Ahmed Alia and Muse Jama. These searches identified several men with the last name of "Jama", born January 1st of various years, three or four of whose addresses matched the address on the warrant—8841 E. Florida. Officer Peterson testified in his deposition that this information caused him to suspect that Jama was a alias used by Mr. Alia, and that combined with the information he had, he believed that Mr. Alia might be living at 1265 Bellaire Street.[5] Officer Peterson did not obtain photographs of Mr. Alia or Mr. Jama, nor did he investigate any other aliases purportedly used by Mr. Alia.

After conducting this investigation, Officer Peterson requested that Officer Bishop assist him in execution of the warrant. Officer Peterson did not advise Officer Bishop of any specific information about the warrant or his investigation. He told Officer Bishop only that he believed that the person residing at 1265 Bellaire Street, #206 under the name of Muse Jama was the person described in the warrant.

---

[5] According to Officer Peterson, this information came from the FBI Letter. Whether it did or came from other source is not material to the analysis here.

4

The Officers arrived at 1265 Bellaire in separate vehicles. Officer Peterson verified with the apartment manager that apartment #206 was rented by a person named Muse Jama. The Officers knocked on the door to apartment #206, and Mr. Jama answered the door. The Officers requested identification from him. He provided them with his Colorado Driver's License, his Social Security Card, and his Metro Denver student identification card. The driver's license and the social security card identified Mr. Jama as Muse Mohamed Jama; the name on the student identification card was Muse Jama. The driver's license listed Mr. Jama's date of birth as 1/1/1980 and descied him as male, 6'0", 145 lbs, with brown eyes. Mr. Jama's social security card reflected a social security number ending in 7830 which matched a social security number purportedly used by Mr. Alia under the alias Salad Cawin. The officers asked Mr. Jama if he had any scars, to which he answered "No".

Officers Peterson and Bishop arrested Mr. Jama on the warrant for Mr. Alia. The Officers told him only that he was being arrested on a warrant, but did not mention the basis for the warrant nor mention the name Ahmed Alia.

Officer Bishop transported Mr. Jama to the Denver Police Department Identification Bureau. Mr. Jama contends that during transport, Officer Bishop engaged in a cell phone call in which he stated that he did not believe that Mr. Jama was the right guy because he didn't have the described scars. Mr. Jama claims that protested his arrest as being a case of mistaken identity, and Officer Bishop responded that any mistake would be resolved at the jail and if there was a mistake, Mr. Jama would be home in two hours.

The police department has the ability to scan and analyze fingerprints, retrieve records from any CCIC database, retrieve photographs from the Colorado Department of Motor Vehicles, and access case files relating to investigations, but apparently no investigation was

5

done. Mr. Jama then transported to the jail, where he remained for 8 days until he posted bond.

## IV. Standard of Review

Rule 56 of the Federal Rules of Civil Procedure facilitates the entry of a judgment only if no trial is necessary. *See White v. York Intern. Corp.*, 45 F.3d 357, 360 (10th Cir. 1995). Summary adjudication is authorized when there is no genuine dispute as to any material fact and a party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Substantive law governs what facts are material and what issues must be determined. It also specifies the elements that must be proven for a given claim or defense, sets the standard of proof and identifies the party with the burden of proof. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Kaiser-Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 565 (10th Cir. 1989). A factual dispute is "genuine" and summary judgment is precluded if the evidence presented in support of and opposition to the motion is so contradictory that, if presented at trial, a judgment could enter for either party. *See Anderson*, 477 U.S. at 248. When considering a summary judgment motion, a court views all evidence in the light most favorable to the non-moving party, thereby favoring the right to a trial. *See Garrett v. Hewlett Packard Co.*, 305 F.3d 1210, 1213 (10th Cir. 2002).

When the movant has the burden of proof on a claim or defense, the movant must establish every element of its claim or defense by sufficient, competent evidence. *See* Fed. R. Civ. P. 56(e). Once the moving party has met its burden, to avoid summary judgment the responding party must present sufficient, competent, contradictory evidence to establish a genuine factual dispute. *See Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991); *Perry v. Woodward*, 199 F.3d 1126, 1131 (10th Cir. 1999). If there is a genuine dispute as to a material fact, a trial is required. If there is no genuine dispute as to any material

fact, no trial is required. The court then applies the law to the undisputed facts and enters judgment.

When the moving party does not have the burden of proof at trial, it must point to an absence of sufficient evidence to establish the claim or defense that the non-movant is obligated to prove. If the respondent comes forward with sufficient competent evidence to establish a *prima facie* claim or defense, a trial is required. If the respondent fails to produce sufficient competent evidence to establish its claim or defense, the claim or defense must be dismissed as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

## V.   Analysis

Mr. Jama asserts a single claim against Officers Peterson and Bishop under 42 U.S.C. § 1983 for violation of his Fourth Amendment right to be free from unreasonable seizure. He alleges that it was unreasonable for the Officers to arrest him based on the warrant issued for Ahmed Alia. He contends that three aspects of the Officers' conduct made the arrest unreasonable. He argues that: (1) the Officers failed to conduct a reasonable investigation prior to the arrest, including by unreasonably relying on the FBI communication, failing to run additional computer searches regarding other listed aliases of Mr. Alia, failing to obtain a photograph of Mr. Alia prior to the arrest; and failing to investigate Mr. Jama's identity at the scene; (2) the mistaken identity arrest was unreasonable because there were numerous discrepancies between Mr. Alia and Mr. Jama; and (3) after the actual arrest, it was unreasonable for the Officers to fail to investigate their own doubts and Mr. Jama's claims of innocence.

The Defendants assert the defense of qualified immunity. The doctrine of qualified immunity protects government officials who perform discretionary government functions from liability for civil damages and the obligation to defend the action. *See Johnson v. Fankell*, 520

U.S. 911, 914 (1997); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). This immunity is only applicable, however, if the official's conduct did not violate clearly established constitutional or statutory rights that would have been known by a reasonable government official. *See Harlow*, 457 U.S. at 818; *McFall v. Bednar*, 407 F.3d 1081, 1087 (10th Cir. 2005).

When a defendant raises a qualified immunity defense, the burden shifts to a plaintiff to satisfy a two-part test. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Green v. Post*, 574 F.3d 1294, 1300 (10th Cir. 2009). A plaintiff must show that he or she had a constitutional right that was infringed (the "violation prong"), and that such right was clearly established at the time of the alleged infringement (the "clearly established prong"). Although a plaintiff must submit evidence that would satisfy both elements to avoid application of the doctrine, the Court has discretion to consider the elements in any order. *See Pearson v. Callahan*, 129 S.Ct. 808, 818 (2009); *Green*, 574 F.3d at 1299.

With respect to the violation prong, a plaintiff must precisely articulate the clearly established right that was allegedly violated and specifically identify the defendant's conduct that violated the right. *See Green*, 574 F.3d at 1300. For the clearly established prong, the question is whether the identified right was clearly established based on the specific facts of the case. *Brosseau v. Haugen*, 543 U.S. 194, 199–200 (2004). Typically, the inquiry is whether, on the operative date, there was binding authority from the Supreme Court or Tenth Circuit (or the clear weight of authority from other circuits) recognizing that particular conduct would constitute a violation of federal law. *York v. City of Las Cruces*, 523 F.3d 1205, 1211–12 (10th Cir. 2008). The inquiry is not whether there was previous case with identical facts, but instead, whether prior caselaw put the defendants on notice that the alleged conduct would be unconstitutional. *See Gomes v. Wood*, 451 F.3d 1122, 1134 (10th Cir. 2006). This is essentially

8

a legal question and is measured by an objective standard. *See Crawford-El v. Britton,* 523 U.S. 574, 589-90 (1998). If a plaintiff establishes both prongs under the qualified immunity analysis, for summary judgment the burden shifts back to the defendant to demonstrate that there are no material facts in dispute. *See Bruning v. Pixler*, 949 F.2d 352, 356 (10th Cir. 1991).

As to Mr. Jama, a single arrest occurred. Without determining whether any one of the alleged deficiencies or combination of deficiencies render the arrest unconstitutional, the Court will address the qualified immunity defense in the context of each alleged deficiency.

Mr. Jama first contends that Officers' pre-arrest investigation was insufficient. For the qualified immunity analysis, the Court focuses first on the clearly established prong. Mr. Jama asserts that it was clearly established that the Officers were required to conduct a more extensive investigation prior to arresting him on the warrant for Mr. Alia. The only Tenth Circuit authority cited by Mr. Jama for this proposition is *Baptiste v. J.C. Penney, Co. Inc.*, 147 F.3d 1252 (10th Cir. 1998).[6] In *Baptiste*, Ms. Baptiste brought a section 1983 claim against police officers for

---

[6] General Fourth Amendment law that seizures must be reasonable is insufficient to meet the clearly established prong as it does not put an officer on notice that *particular* conduct is unconstitutional. *See Brosseau*, 543 U.S. at 199–200; *Jones v. Hunt*, 410 F.3d 1221, 1230 (10th Cir. 2005).

Additionally, Mr. Jama's citations to authority from other districts is not sufficient to clearly establish a constitutional violation. *See York*, 523 F.3d at 1211–12 (holding that a constitutional violation is "clearly established" when it is the articulated in binding Tenth Circuit or Supreme Court authority). Furthermore, the cases to which Mr. Jama cites do not establish the level of investigation that an officer must undertake prior to arresting a person based on an alias listed on a warrant. For example, although the district court in *United States v. Palacios* found that the mistaken arrest was not reasonable based partially on the fact that the officers failed to look at a photograph prior to arresting a suspect on a warrant, the determination was also based on the fact that the officers arrested a substantially older man when they were looking for a man in his twenties. *See* 666 F.Supp. 113, 115 (S.D. Tex 1987). The other cases cited are factually distinguishable as they do not address the investigation an officer must undertake prior to arresting based on an alias in a valid warrant. *See Evett v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force*, 330 F.3d 681, 688 (5th Cir. 2003) (addressing an officer's determination of probable cause for an arrest without a warrant); *Clipper v. Takoma Park*, 876 F.2d 17, 19 (4th

9

violating her Fourth Amendment rights in detaining her following allegations of shoplifting. While Ms. Baptiste was shopping, store security guards reviewed an surveillance video. Based on the video, they suspected that she had shoplifted a ring and confronted her with such accusation. In response, she emptied her bags and provided receipts for the items in her possession, including two rings. Unconvinced as to her innocence, the security guards called police officers for assistance.

The officers both interviewed the guards and reviewed the security video. The video showed Ms. Baptiste take a ring out her bag and place it on her finger, compare the ring with other rings in the store, and place a ring in her bag. With another ring in her hand, she looked for a sales person. After a gap in the recording, the video showed Ms. Baptiste making a purchase. Based on the video and the statements of the security guards, the officers searched Ms. Baptiste's bags and conduct a pat-down search of her person. Finding nothing, they released her.

The Tenth Circuit treated the incident as a warrantless arrest and search incident to arrest and, accordingly, considered whether there was probable cause for a warrantless arrest. The Court concluded that the officers did not have probable cause to detain and search Ms. Baptiste. In so holding, the Court rejected the contention that the security guards' statements about the video were sufficient to establish probable cause because the officers independently viewed the video. The Tenth Circuit cited to a Seventh Circuit case, *Be Vier v. Hucal*, 806 F.2d 123, 128 (7th Cir. 1986), which stated that "A police officer may not close her or his eyes to facts that would help clarify the circumstances of an arrest." Mr. Jama relies on the reference to *Be Veier* as the Tenth Circuit's endorsement of an officers' duty to adequately investigate prior to

---

Cir. 1989) (addressing investigation prior to obtaining a warrant).

arresting an individual based on an alias name.

The Tenth Circuit's citation to *Be Vier* is superficially supportive of an obligation of arresting officers to be careful and comprehensive in their assessment of apparent facts. However, the reference, especially in light of a wholly different fact pattern, cannot be read to clearly establish obligations of officers to engage in particular investigation prior to arresting a person pursuant to warrant. *See Brosseau*, 543 U.S. at 199–200 (requiring that the authority be sufficient to clearly establish that *particular* conduct is unconstitutional). *Baptiste* did not address arrests based on facially valid warrants, arrests based on aliases, nor mistaken identity arrests; rather, it addressed warrantless arrests. Most importantly, *Baptiste* did not concern a failure of an officer to obtain information, but instead concerned a situation where officers erred by relying on statements made by others when they had reviewed the evidence themselves. Therefore, it provides no guidance to an officer as to the level of investigation he must complete prior to making an arrest on an alias.[7] Accordingly, Mr. Jama has not met his burden of demonstrating the clearly established prong and the Officers are entitled to qualified immunity on this claim.

Turning to Mr. Jama's arguments in categories 1 and 3, *supra*, the Court also begins with the clearly established prong. The parties agree that the clearly established law governing mistaken identity arrests is set out in *Hill v. California*, 401 U.S. 797, 802 (1971). In *Hill*, police officers obtained an arrest warrant for Mr. Hill, which included his age, physical description, and address. When they arrived at Mr. Hill's apartment, Mr. Miller, who fit Mr. Hill's physical

---

[7] Mr. Jama has also not provided any authority as to whether it is reasonable for an officer to rely on information provided by the FBI in arresting a person based on an alias in a warrant.

description, was present in the apartment but Mr. Hill was not. Despite Mr. Miller's protests that he was not Mr. Hill and production of an identification card indicating he was Mr. Miller, the police officers believed Mr. Miller to be Mr. Hill and arrested him on the warrant for Mr. Hill. They also conducted a search of the apartment incident to the arrest, which resulted in seizure of a number of items that were subsequently used to convict Mr. Hill of robbery.

Mr. Hill appealed his conviction arguing that the evidence was not admissible because Mr. Hill, the subject of the arrest warrant, had not actually been arrested prior to the search. The Supreme Court framed the issue as whether Mr. Miller's arrest was constitutional, because if it was constitutional then the subsequent search was constitutional and the evidence admissible. The Supreme Court concluded that "when the police have probable cause to arrest one party, and when they reasonably mistake a second party for the first party, then the arrest of the second party is a valid arrest." It reasoned that the arrest was a "reasonable response to the situation facing them at the time." To support the finding of reasonableness, the Supreme Court noted that the officers executed the search warrant at Mr. Hill's apartment on a person who met the description of Mr. Hill. The fact that Mr. Miller produced identification showing that he was, in fact, Mr. Miller, did not make the arrest unreasonable because aliases and false identifications are not uncommon. Accordingly, it is clearly established that mistaken identity arrests are governed by a "reasonableness" standard—whether the officer's mistake as to the identity was reasonable under the circumstances facing him or her at the time of the arrest. *See id.*; *Illinois v. Rodriguez*, 497 U.S. 177, 186 (1990) (holding that mistakes, in and of themselves, do not constitute unreasonableness if the mistakes themselves are reasonable).

Mr. Jama argues that *Hill* clearly establishes that it was unreasonable for the Officers to

arrest him given the numerous discrepancies[8] between the description of Mr. Alia and him. Mr. Jama's reliance on *Hill* for this proposition, however, is misplaced. Mr. Jama is correct that *Hill* addresses mistaken identity arrests and provides a general guiding principle in dealing with mistaken identity arrests, *i.e.*, that arrests premised on mistaken identity are not *per se* unconstitutional as long as the mistake is reasonable given the situation facing the arresting officer. The case does not, however, clearly establish, nor even address, what degree of similarity between the suspect and the description in the warrant must be present to make an arrest reasonable, nor when it is reasonable to arrest someone based on the purported use of an alias. Rather, *Hill* provides that reasonable mistakes do <u>not</u> constitute constitutional violations, and demonstrates that an arrest based on similarities in descriptors is reasonable even in the face

---

[8] The undisputed facts demonstrate both differences and similarities between the description of Mr. Alia and Mr. Jama. Muse Mohamed Jama is listed as an alias of Mr. Alia both in the warrant itself and in the FBI Letter. Both men also have birth dates of January 1, although in different years (Mr. Jama's date of birth is 1/1/1980 and Mr. Alia's is 1/1/1981). However, the warrant indicates that Mr. Alia also used 1/1/1980 as a date of birth in connection with other alias names. Mr. Jama's social security number matches is a number that Mr. Alia allegedly used. The address listed on the warrant (8841 E. Florida) is different than Mr. Jama's address (1265 Bellaire Street). The physical characteristics of the two men are strikingly similar: both are black men with black hair and brown eyes, are approximately six feet tall (Mr. Jama is 6'0" and Mr. Alia is 5'11'), and are roughly the same weight (Mr. Jama was listed as 145 lbs while Mr. Alia was listed as 130 lbs). The only significant physical difference between the two is that Mr. Alia is noted to have numerous scars, including some on his face, which Mr. Jama does not have. Interestingly, however, Mr. Alia is noted to have different scars under his own name (on his upper lip and right arm) and under various aliases (Mohamed Mahudu Ali listed as having a scar on his forehead, Adbiquani Ahmed listed as having a scar on his left elbow). Some aliases, including Muse Jama, do not include a notation of a scar.

To the extent that Mr. Jama argues that the criminal numbers assigned to Mr. Alia were not assigned to him, he is merely reiterating that he is not Mr. Alia. Additionally, these numbers were not the basis on which Mr. Jama was arrested; rather, he was arrested based on name, alias, and physical similarities.

of some contrary evidence that the individual is the person described in the warrant.⁹  As such, it cannot serve to put an officer on notice that the arrest of a suspect who has the same name as an alias used by the suspect and matches a warrant's description of the suspect, albeit with some differences, is unconstitutional.¹⁰  Thus, as Mr. Jama has not met his burden on the clearly established prong, Officers Peterson and Bishop are entitled to qualified immunity on this claim.

Finally, as to Mr. Jama's claim that it was unreasonable for the Officers to not further investigate once Mr. Jama expressed his innocence and/or they developed doubts that Mr. Jama was in fact Mr. Alia, he has cited to no authority establishing that the Officers had such a duty.¹¹  Although not cited by Mr. Jama, the Supreme Court's decision in *Baker v. McCollan*, 443 U.S. 137 (1979), provides some guidance for an officer confronting a claim of mistaken identity.  In *Baker*, the plaintiff asserted a section 1983 claim based upon his arrest pursuant to a warrant.  The warrant was issued for the plaintiff, but was based on conduct by his brother, who had stolen his identity.  Despite the plaintiff's repeated protests of innocence, he was detained for three

---

⁹ In *Hill*, the contrary evidence was an identification card indicating that Mr. Miller was, in fact, Mr. Miller and not Mr. Hill.  Here, the only substantial contrary evidence is Mr. Jama's lack of scars and potentially the different address (although addresses are often and easily changed).

¹⁰ Again, generalized Fourth Amendment standards requiring that arrests be reasonable and based on probable cause are not sufficient to clearly establish that the Officers' *particular* conduct in this case was unconstitutional because it does not address arrests based on alias listed in valid warrants, FBI tips, or physical similarities.  *See Brosseau*, 543 U.S. at 199–200; *Jones*, 410 F.3d at 1230.

¹¹ This is the most troubling of the allegations because it appears that the Denver Police Department had the means by which to investigate Mr. Jama's claims of mistaken identity, but did not.  However, it is not clear that either of these Officers had a clearly established obligation to do so. Officer Peterson's involvement ended once Mr. Jama was arrested.  Officer Bishop's involvement ended when Mr. Jama was transported to the Denver jail.  There is no evidence that either officer had the opportunity or obligation to further investigate Mr. Jama's identity after his arrest and transport.

days. When officers eventually realized the mistake, the plaintiff was released.

The Supreme Court affirmed dismissal of the section 1983 claim for violation of the plaintiff's Fourth Amendment rights. Reasoning that the plaintiff's claim was based on the failure to investigate his claim of innocence after he was arrested, not for the arrest itself, the Court determined that arrest was executed pursuant to a valid warrant under the Fourth Amendment. In dicta, the Court stated that it did not believe that an officer executing a valid warrant based on probable cause is constitutionally required to independently investigate every claim of innocence, whether based on mistaken identity or otherwise. The Court also noted that in cases of mistaken identity, a post-arrest due process claim may arise for failure to investigate a repeated claim of innocence over a prolonged period of time.[12] Although *Baker* is distinguishable from this case for a number of reasons,[13] it suggests that an officer does not have an affirmative duty to investigate every claim of mistaken identity.

Additionally, a more recent case involving identity issues, *Reyes v. Bd. of County Comm'rs of the County of Arapahoe*, 2008 U.S. Dist. LEXIS 28949 (D. Colo. Apr. 8, 2008) (unpublished), *aff'd*, *Reyes v. Bd. of County Comm'rs*, 311 Fed. App'x 113 (10th Cir. Feb. 6, 2009) (unpublished) follows this lead.[14] In *Reyes*, the plaintiff brought a section 1983 claim for violation of his Fourth Amendment rights based upon an arrest pursuant to warrant identifying an individual with the same name, same general physical description including a scar on his right

---

[12] Mr. Jama has not asserted a Fourteenth Amendment claim against the Officers.

[13] *Baker* addressed an arrest based on a stolen identity rather than a mistaken identity and addressed a due process claim rather than a Fourth Amendment claim.

[14] The fact that these cases are not published might be understood to evidence a belief that no new standard for constitutionally sufficient conduct was being announced.

arm, and the same Kansas identification number. The proper subject of the warrant had used a number of aliases, birth dates, and social security numbers, including Mr. Reyes' birth date and social security number. However, Mr. Reyes' middle name was Jose which did not match any alias used by the subject of the warrant. Mr. Reyes was detained for approximately two weeks during which he appeared before a court, was assigned a public defender, signed an extradition form, and was extradited to Kansas.

The district court determined that the plaintiff had not alleged a violation of his Fourth Amendment rights in his section 1983 action for the arrest. It reasoned that it was reasonable for the officers to conclude that the plaintiff was the person named in the warrant based on the numerous matching identifiers. It noted that although further investigation, such as a fingerprint comparison, would have revealed the error, the officers were not under any affirmative duty to conduct such investigation, especially in light of the plaintiff's failure to assert his claim of mistaken identity. On appeal, the Tenth Circuit affirmed the district court noting its agreement with the analysis of the lower court. *See Reyes v. Bd. of County Comm'rs*, 311 Fed. App'x 113 (10th Cir. Feb. 6, 2009) (unpublished). Again, this case suggests that the arresting officers do not have an affirmative duty to investigate claims of innocence by an arrestee. Accordingly, Mr. Jama has not met his burden of establishing that the Officers' failure to investigate his claims of innocence (or their own subjective doubts as to his guilt) was a violation of the Fourth Amendment and, therefore, the Officers are entitled to qualified immunity on this claim also.

**IT IS THEREFORE ORDERED** that

(1) Defendants Kurt Peterson and John Bishop's Motion for Summary Judgment **(#277)** is **GRANTED**.

(2) Mr. Jama's Claim against Defendants John Bishop and Kurt Peterson is

**BARRED BY QUALIFIED IMMUNITY**.

(3)     This being the only claim asserted against Defendants Peterson and Bishop, their names shall be removed from the caption of all further filings.

Dated this 9th day of September, 2010

                                          **BY THE COURT:**

*/s/ Marcia S. Krieger*

                                        Marcia S. Krieger
                                        United States District Judge