# In the United States District Court
# for the District of Colorado

Civil Action No. 1:08-cv-01693-MSK-KLM

MUSE JAMA,
JOSE ERNESTO IBARRA, and
DENNIS MICHAEL SMITH,

  Plaintiffs,

ANTONIO SANCHEZ,

  Plaintiff-Intervenor,

v.

CITY AND COUNTY OF DENVER,

  Defendant.

---

## Plaintiffs and Intervenors' Objection to Magistrate Judge's Ruling on Denver's Motion to Strike Individuals and Documents Identified in Fourth Supplemental Disclosures

---

  Plaintiffs and Intervenor (collectively, "Plaintiffs"), through their attorneys, object under 28 U.S.C. § 636(b) (2006) and Federal Rule of Civil Procedure 72(b) to the Magistrate Judge's dispositive ruling (Doc.487) granting Denver's motion to strike individuals and documents (Doc.451) identified in the Fourth Supplemental Disclosures (Doc.447). Plaintiffs request a *de novo* determination of Denver's motion to strike and vacatur of the Magistrate Judge's Order. In the alternative, Plaintiffs object under § 636(a) and Rule 72(a).

# Table of Contents

Introduction .................................................................................................................1

Standard of Review .....................................................................................................5

I.   The Magistrate Judge erred in barring Plaintiffs from using documents that Denver itself produced pursuant to its disclosure and discovery obligations. ....7

   A.   The Magistrate Judge erroneously prohibited Plaintiffs from making use of documents that "mention," "name" or "reference" mistaken-identity victims listed in the Fourth Supplemental Disclosures. ..............................7

      Summary. .......................................................................................7

      Discussion. .....................................................................................8

   B.   The Magistrate Judge erred in barring Plaintiffs from using any documents disclosed or produced in this action. ..........................................................15

II.   The Magistrate Judge erred in determining that the individuals identified by name in the Fourth Supplemental Disclosures were improperly disclosed.......16

   A.   All 100 individuals with knowledge of specific mistaken identity arrest and detention were timely disclosed by Denver and/or re-disclosed by Plaintiffs well before November 2011. ......................................................................19

     1.   Summary.................................................................................19

     2.   Relevant facts. .......................................................................20

       a.   Denver itself disclosed to Plaintiffs 95 of the 100 victims of mistaken identity arrest and detention named in the Fourth Supplemental Disclosures. .............................................21

         Denver's disclosure of three of the 100 individuals ......................22

         Denver's disclosure of an additional 87 individuals.......................23

         Denver's disclosure of an additional five victims..........................26

       b.   Plaintiffs disclosed and/or re-disclosed to Denver 83 victims of mistaken identity arrest and detention identified in the Fourth Supplemental Disclosures. .............................................28

         Plaintiffs' disclosure of three victims. ...........................................28

         Plaintiffs' disclosure/re-disclosure of 83 of the 100 victims. .........29

Denver's knowledge of the victims' importance to Plaintiffs' *Monell* legal theories. ...................................................30

3. All 100 victims of mistaken identity arrest and detention by Denver were timely disclosed, by Denver and/or by Plaintiffs. .......................37

4. The Magistrate incorrectly ruled that Plaintiffs were required to disclose "fact witnesses." ......................................40

5. The information provided about the 100 victims of mistaken identity arrest and detention complied with Rule 26(a)(1)(A)(i). .....................47

6. The Magistrate Judge erred in ruling that Denver's ability to depose the victims was impaired by the timing of the November 2011 disclosures. ...................................................49

B. The four victims who provided affidavits were timely disclosed by Denver and/or Plaintiffs; the Magistrate Judge erred in excluding the four victims and their affidavits. ...................................................51

Luiz Manuel Carlos...................................................51

Carlos Alberto Hernandez...................................................53

Joseph Ronald Walker...................................................55

Scott Alan Jackson ...................................................56

C. The remaining individuals identified by name in the Fourth Supplemental Disclosures were properly disclosed. ...................................................58

1. Specific Denver current or former officials, employees or agents. ......58

2. All individuals who were deposed. ...................................................60

3. Denver law enforcement officers who participated in Plaintiffs' arrest and detention. ...................................................61

4. Individuals identified in depositions. ...................................................62

III. The Magistrate Judge erred in imposing drastic sanctions that effectively terminate this litigation. ...................................................62

A. To the extent Plaintiffs failed to timely disclose any individual, the failure was substantially justified...................................................64

B. To the extent Plaintiffs failed to timely disclose any individual, it was harmless. ...................................................65

1. Denver suffered no prejudice or surprise. ...................................................65

2.   Denver has suffered no prejudice requiring curing. ..............................69

3.   The victims' testimony will disrupt neither the summary judgment proceedings nor trial. ...........................................................................70

4.   The Magistrate Judge erred in finding "bad faith" by Plaintiffs. ..........73

Conclusion ............................................................................................................77

# Introduction

This Objection arises out of the Magistrate Judge's Order granting Denver's motion to strike all individuals and documents listed in Plaintiffs' November 2011 Fourth Supplemental Disclosures. The Order effectively ends Plaintiffs' lawsuit in Denver's favor.

The Order bars Plaintiffs from using at any time for any purpose in this action any of the stricken individuals and documents, which necessarily results in the granting of summary judgment against Plaintiffs and the termination of this action. In sweeping language, the Order also appears to impose an extraordinary sanction: Plaintiffs are barred from using at any time for any purpose in this action _Denver's own documents that mention, name or reference any of the stricken individuals_. This dooms a key theory of Denver's _Monell_ liability—Denver's custom of disregarding a widespread practice of mistaken identity arrests and detentions.

The Order resulted from an improper and unfair procedure. Before Plaintiffs filed their summary judgment response, Denver filed a four-page cursory motion vague on facts and prejudice, but ambitious in its requested remedy. Plaintiffs argued Denver failed to carry its burden and had made only conclusory and unsupported arguments about prejudice. After Plaintiffs filed their summary judgment response, Denver submitted a detailed reply. It asserted new, erroneous

facts, issues and arguments not included in its motion, including specific arguments about prejudice that relied on specific pages of Plaintiffs' summary judgment response and the alleged difficulty of remedying the alleged prejudice. Plaintiffs' strongly disagreed with these new arguments and their claimed factual basis, but had no opportunity for rebuttal. Without affording Plaintiffs an opportunity to address these new matters, the Magistrate Judge accepted Denver's reply arguments and issued the Order.

This unfair procedure led the Magistrate Judge to make key factual and legal errors in her findings. Those errors, in turn, led to the imposition of unwarranted, draconian sanctions that effectively terminate this case in Denver's favor. Plaintiffs request the vacatur of the Order in its entirety and *de novo* determination of the motion to strike.

The sanctions imposed under the Order are summarized in this chart:

| Individuals Disclosed in 4th Supp. Discls. | Magistrate Judge's Order |
|---|---|
| Ninety-six named individuals who were victims of mistaken identity arrest and/or detention as to whom Plaintiffs have offered no testimonial evidence for any purpose at any time. | Excluded from use at any time for any purpose |
| Four named individuals who were victims of mistaken identity arrest and/or detention as to whom Plaintiffs offered affidavit testimony in their summary judgment response | Excluded from use at any time for any purpose |
| Eight named Denver officials, employees or agents as to whom Plaintiffs have offered no testimonial evidence for any purpose at any time. | Excluded from use at any time for any purpose, except for three individuals |

| | |
|---|---|
| Category #1: All individuals who were deposed. The transcripts of numerous depositions were used by both parties in the pending summary judgment proceeding. | Excluded from use at any time for any purpose |
| Category #2: All Denver law enforcement officers who investigated, arrested or detained any of the original plaintiffs and intervenor in this action. The transcripts of many of these officers' depositions were used by both parties in the pending summary judgment proceeding. | Excluded from use at any time for any purpose |
| Category #3: All individuals identified in depositions, the transcripts of which were used by both parties in the pending summary judgment proceeding. | Excluded from use at any time for any purpose |
| **Documents Disclosed in 4th Supp. Discls.** | |
| DDS00001-47 (publicly available Denver County Court docket sheets) | Not excluded |
| PLF00001-20 (four affidavits executed by four of the 96 victims of mistaken-identity arrest, which Plaintiffs attached to their summary judgment response) | Excluded from use at any time for any purpose |
| All documents attached to or referenced in the parties' court filings. Plaintiffs have referenced sealed or restricted-access documents in their summary judgment response. | Not excluded so long as they are publicly available; excluded from use at any time for any purpose if they are not publicly available |
| All documents disclosed or produced by the parties. Both parties have used thousands of pages of such documents in the pending summary judgment proceeding. | Excluded from use at any time for any purpose |
| All publicly available publications of Denver law enforcement policies, rules, directives or general orders | Not excluded |

The length of this Objection is warranted by the drastic and litigation-ending

sanctions; the lack of opportunity afforded to Plaintiffs to respond to new issues

and arguments raised by Denver in its reply in support of its motion to strike; and

the lack of opportunity for Plaintiffs to address the Magistrate Judge's *sua sponte*

findings, which Denver itself did not discuss or request in its motion, e.g., that

Plaintiffs and their counsel engaged in "bad faith" litigation. Nothing in Denver's four-page motion—bereft of evidence or specifics—suggested that it would result in the termination of this lawsuit.

Additionally, given the massive documentation of Plaintiffs' disclosures *via* letters during a 10-month span in 2009 and 2010 between Plaintiffs' and Denver's counsel, we did not predict Denver would argue—as it did for the first time in its reply—that the individuals identified in the Fourth Supplemental Disclosures had somehow been buried "in the thousands of documents produced in this case." That is a misstatement of fact, and we prove it is a factual misstatement in this Objection. Nor did we predict that Denver in its reply would argue that the timing of the Fourth Supplemental Disclosures prevented it from using "discovery" to obtain information about the disclosed individuals. That, too, is a misstatement of fact. With five exceptions, *every one* of the victims of mistaken identity arrest and detention identified in the Disclosures were first disclosed by Denver *after discovery cut-off*. As to the five, either Denver or Plaintiffs disclosed them *well before discovery cut-off*.

4

## Standard of Review

Title 28, section 636(b)(1), of the United States Code provides that when a magistrate judge enters a ruling disposing of an action, the district judge "shall make a *de novo* determination." [1] *Accord* Fed. R. Civ. P. 72(b).

Denver moved for Rule 37 sanctions against Plaintiffs for alleged untimely disclosure of documents and individuals with information. Magistrate judges have general authority to order discovery sanctions. *Ocelot Oil Corp. v. Sparrow Indus.*, 847 F.2d 1458, 1462 (10th Cir. 1988). "They may not do so, however, if those sanctions fall within the eight dispositive motions excepted in [§ 636(b)(1)(A)]," including a motion to involuntarily dismiss an action. *Id.* A sanction that "has the effect of dismissing [an] action . . . is . . . beyond the power of a magistrate to order." *Id.*; *see id.* at 1463 ("Section 636 may not be read to confer more power on magistrates than the Constitution permits.") (footnote omitted). It is irrelevant whether the magistrate judge's order is characterized as a discovery or other pretrial sanction. *Id.* at 1462.

---

[1] Rule 72 and § 636(b) provide that a party may serve and file objections to a magistrate judge's dispositive order within 14 days after being served with a copy. The Magistrate Judge's Order was entered and served on February 8, 2012. The Court granted Plaintiffs' timely motion for extension of time, and extended the time for filing this Objection to and including March 5, 2012. Doc.490. This Objection is therefore timely.

The Magistrate Judge's Order has the effect of entering summary judgment against Plaintiffs and otherwise terminating their lawsuit. On its face, the Order appears to bar Plaintiffs from using at any time for any purpose in this action Denver's documents that mention, name or reference any of the stricken individuals. This bar results in the suppression of hundreds of pages of documents supporting a key theory of Denver's *Monell* liability and, effectively, in the dismissal of that theory.

The Order goes further. It bars Plaintiffs from using for any purpose at any time in this litigation any of the 100 victims of mistaken identity arrest and detention and other individuals disclosed by name or by category in the Fourth Supplemental Disclosures. The excluded individuals include (a) non-party victims of mistaken identity arrests and detentions, almost of whom were first identified and disclosed to Plaintiffs by Denver; (b) all individuals or entities deposed by any of the parties; and (c) each law enforcement officer who participated in the arrest and detention of Plaintiffs and the defendant City and County of Denver. The Order precludes Plaintiffs from using any of these individuals for any purpose. On its face, the Order also bars Plaintiffs from using for any purpose at any time in this litigation any of the documents disclosed in the Fourth Supplemental Disclosures, including all documents "disclosed or produced by the parties."

6

Because the Order effectively terminates this action in Denver's favor, this Court must make a *de novo* determination of Denver's motion to strike and assess to what extent, if any, it is entitled to the relief it requests. In the alternative, Plaintiffs request review under Rule 72(a)'s "clearly erroneous" and "contrary to law" standards. Under either standard, the Order cannot be sustained.

## I. The Magistrate Judge erred in barring Plaintiffs from using documents that Denver itself produced pursuant to its disclosure and discovery obligations.

Of immediate concern to Plaintiffs are those portions of the Magistrate Judge's Order barring Plaintiffs from using in the pending summary judgment proceeding documents previously disclosed or produced by the parties. *See* Doc.487 at 8; *see id.* at 5 (stating that Plaintiffs' summary judgment response relied on "evidence" "drawn from" individuals identified in Fourth Supplemental Disclosures").

### A. The Magistrate Judge erroneously prohibited Plaintiffs from making use of documents that "mention," "name" or "reference" mistaken-identity victims listed in the Fourth Supplemental Disclosures.

**Summary.** Denver's motion to strike requested exclusion only of documents and witnesses identified in the Fourth Supplemental Disclosures. The Magistrate Judge, however, went far beyond Denver's motion. The Magistrate Judge barred Plaintiffs from using hundreds of pages of documents attached to Plaintiffs'

summary judgment response. These documents, almost all of which had been previously disclosed by Denver, contain admissions that Denver was responsible for hundreds of mistaken identity arrests/detentions.

Even if there were a valid ground for barring Plaintiffs' use of the individuals identified in the Fourth Supplemental Disclosures as testimonial witnesses—and there was no valid ground—there was no basis to bar Plaintiffs from relying on Denver's documentary admissions. The bar on use apparently was based on the Magistrate Judge's unfamiliarity with the response and on Denver's incorrect implication that the documents contained the *testimony* of allegedly untimely-disclosed individuals. In fact, the documents contain no testimony of the individuals. *Denver* produced virtually all these documents to Plaintiffs, and these documents constitute *admissions by Denver*.

**Discussion.** In its motion to strike, Denver argued, without specificity, that it had suffered prejudice from the November 2011 disclosure of the individuals in the Fourth Supplemental Disclosures. In Denver's reply, for the first time in the Rule 37 proceedings, Denver implied that Plaintiffs had made *testimonial use* of 87 of the disclosed individuals. *See* Doc.486 at 3 ¶ 5. It did this by citing 33 pages from Plaintiffs' summary judgment response (various pages between page 48 to 134) and pointing to two voluminous exhibits. In these pages and in these exhibits,

Denver said, Plaintiffs had "mentioned," "named" or "referenced" the 87 individuals. *See id.* The implication was that in these pages and exhibits, Plaintiffs had somehow made testimonial use of these 87 individuals.

The implication was incorrect. In their summary judgment response, Plaintiffs used the testimony of four—and only four—of the individuals listed by name in the Fourth Supplemental Disclosures: Luiz Manuel Carlos, Carlos Alberto Hernandez, Scott Alan Jackson, and Joseph Ronald Walker. In discussing the mistaken identity arrests of those four individuals, however, Plaintiffs' summary judgment response relies primarily on documents produced in 2009 and 2010, including documents *produced by Denver* which constitute admissions by Denver that it carried out the mistaken identity arrests and detentions.

For example, Fourhorn General 011674-76 (found in Document 458-21) is a 2009 letter to a *Denver Post* reporter from Mary Dulacki, custodian of records for Denver's Manager of Safety. In the letter, which Denver did not disclose until March 2010, Ms. Dulacki admits Denver mistakenly arrested and detained Luiz Manuel Carlos. Plaintiffs relied on this letter in their summary judgment response, in addition to the affidavit from Mr. Carlos that was disclosed in November 2011. *See* Doc.454-1 at 88.

As to virtually every other "mention," "naming" of or "reference" to a victim of mistaken identity arrest and detention, Plaintiffs relied solely on publicly available documents (e.g., court dockets) or documents _Denver had produced to Plaintiffs_, primarily pursuant to the Court's September 2009 order compelling Denver to produce documents. A large number of these documents constitute admissions by Denver that it mistakenly arrested or detained an innocent person.

The two voluminous exhibits contain no testimonial use of any victims of mistaken identity arrest and detention. The two exhibits contain Rule 1006 materials created by Plaintiffs' counsel from publicly-available documents and the documents _produced by Denver_. The Order does not reference the exhibits directly. Doc.487 at 5. However, the Order uses language suggesting that to the extent the exhibits contain "evidence related to the [victims identified in the Fourth Supplemental Disclosures]," they exhibits are excluded from consideration at any time and for any purpose in this litigation. _See_ Doc.487 at 5-6, 8. The exhibits contain no testimony from any of the victims identified in the Fourth Supplemental Disclosures.

To be clear: Except for the four individuals who provided affidavits, _Plaintiffs did not use testimony of any individual listed by name in the Supplemental Disclosures_. Below is a chart containing the summary judgment

response page numbers Denver cited in its reply as support for its claim of
prejudice, and the source of the information for any individual listed by name in
the Fourth Supplemental Disclosures who is mentioned, named or referenced on
that page of Plaintiffs' summary judgment response. *None* of the documents under
the "Denver" column contains *any testimony from any individual*.

| "Use" of Documents vs. Individuals in Plaintiffs' Summary Judgment Response | | | | |
|---|---|---|---|---|
| Pg. No. | Name | Testimony Used? | Source of the Document Referencing the Individual | |
| | | | Denver | Plaintiffs |
| 48 | No names on this page | N/A | N/A | N/A |
| 50 | Jamie Milner | No | FH General 004481, 12136-37[2] | |
| 50 | Carolyn Anderson | No | FH General 004492, 12146-47 | |
| 50 | Jerica Montano | No | FH General 004492, 12187-88 | |
| 51 | Jamie John Vigil | No | FH General 004490 | DCC166-67 (this is a publicly available court record) |
| 51 | Thomas M. Urban | No | FH General 004484 | DCC105-06 (this is a publicly available court record) |
| 54 | Marcell Johnson | No | FH General 012179-80 | |
| 54 | Edwardo Hernandez-Flores | No | FH General 012037-38 | |
| 55 131 | Margaret Susan Rosenfeldt | No | FH General 011858-59 | |

---

[2] All the "FH General" or "Fourhorn General" Bates-numbered documents used in Plaintiffs' summary judgment response are found in Docs.456-11, 456-16 & 456-22.

| 56 | No names on this page | N/A | N/A | N/A |
|---|---|---|---|---|
| 57 | No names on this page | N/A | N/A | N/A |
| 58 | No names on this page | N/A | N/A | N/A |
| 59 94 113 | [Scott A.] Jackson | Yes | FH General 005004, 006709, 006724, 010674-75 | PLF000013-16 (produced to Denver on 11/7/11) |
| 62 | Enia Richardson | No | FH General 001377-79, 003554-55, 003560, 003565, 004493 | DCC181 (this is a publicly available court record) |
| 70 | Epifanio Arzola-Equina | No | FH General 005011-13, 006756, 006758, 006764-65 | |
| 75 | SLR[3] | No | FH General 4490, 12116-19, 012372 | DDS028-29 (these are publicly available court records) |
| 82 115 117 132 133 134 | Carlos A. Hernandez | Yes | FH General 003651-52, 003655, 003700, 003703, 003705 | PLF005-12 (produced to Denver on 11/7/11); Hernandez,C 0003-09, 0047-48, 0052-53 (produced to Denver on 9/9/09) |
| 82 | Joseph Ronald Walker | Yes | FH General 001318-19, 003419 | PLF0017-20 (produced to Denver on 11/7/11); Walker,J 000004 (produced to Denver on 9/9/09) |
| 86 | Chris Lechner | No | FH General 011676 | |
| 87 | Marcel Johnson | No | FH General 002868, 002870, 012179-80 | |
| 88 | Luiz Manuel Carlos | Yes | FH General 011675 | PLF000001-04 (produced to Denver on 11/7/11) |
| 88 | Alison Duckworth | No | FH General 009102 | |
| 88 | Keith Mitchell | No | FH General 001829, 001842, 011676 | Mitchell,K 000001, 000014 (produced to Denver on 9/9/09) |

---

[3]We use only the victim's initials for the reason stated in footnote 11.

| 89 | Willie Lay | No | FH General 004409 | |
| 90 | Jaime Amaro-Deleon | No | FH General 003113-14, 003117-18 | |
| 91 | Nathaniel Alexander Johnson | No | FH General 003109-11 | |
| 115 | No names on this page | N/A | N/A | N/A |

The Magistrate Judge did not conduct the foregoing review of these Denver-cited pages from Plaintiffs' summary judgment response. Instead, she accepted Denver's implication that Plaintiffs had made testimonial use of 87 of the individuals listed by name in the Fourth Supplemental Disclosures. In her Order, the Magistrate Judge stated that because of the "timing" of the Fourth Supplemental Disclosures, Denver "has not had the opportunity to investigate the *evidence related to the witnesses* who are listed in the Fourth Supplemental Disclosures and relied on by Plaintiffs in their voluminous response to the motion for summary judgment." Doc.487 at 5 (emphasis supplied). Immediately afterward, the Magistrate Judge cited to the same pages Denver cited in its reply. On page 6 of the Order, the Magistrate Judge accepted Denver's argument, finding that Plaintiffs had placed "significant reliance on *evidence drawn from the witnesses* identified in the Fourth Supplemental Disclosures in their" summary judgment response (emphasis supplied). This was incorrect. As Plaintiffs explain below, in virtually every case, Plaintiffs did not rely on "evidence drawn from the

witnesses." Plaintiffs relied on documents Denver produced that constitute admissions, as well as documents that Plaintiffs produced in 2009.

The Fourth Supplemental Disclosures names 100 victims of mistaken identity arrest and detention. Doc.447 at [1]-15 (¶¶ A.1-23, 25-38, 40-51, 53-54, 56-58, 60-64, 66-89, 91-98, 100-08). Since Plaintiffs presented the testimony of only *four* individuals listed in the Fourth Supplemental Disclosures, the Magistrate Judge's conclusions are error. With regard to the remaining 96 victims, *no* "evidence" was "drawn from" any of them. Instead, in almost every case of mistaken identity arrest discussed in the cited pages of the summary judgment response, Plaintiffs used the non-testimonial documentary evidence—which constitute admissions of a party-opponent—*produced by Denver*.[4] The documentary evidence contained Denver's admissions it had carried out hundreds of mistaken identity arrests and detentions. Even as to the four individuals from whom Plaintiffs secured affidavits, Plaintiffs presented not only testimony from those four individuals, but also Denver's *admissions* concerning their mistaken identity arrest and detention in the form of documentary evidence produced by Denver.

---

[4]In some additional cases, Plaintiffs also relied on documents they obtained and had produced to Denver by September 9, 2009.

Even if it were appropriate to prohibit Plaintiffs from introducing in the pending summary judgment proceedings the four allegedly late-disclosed affidavits, the Magistrate Judge erred in prohibiting Plaintiffs from using earlier-disclosed documents that were not at issue in the motion to strike, including Denver-produced documents that mention, name or reference any victim of mistaken identity arrest and detention.

### B. The Magistrate Judge erred in barring Plaintiffs from using any documents disclosed or produced in this action.

One of the categories disclosed in the Fourth Supplemental Disclosures was, "All documents disclosed or produced by the parties."[5] Doc.447 at 15. Another category was, "All documents attached to or referenced in the parties' court filings." *Id.*

The Magistrate Judge prohibited Plaintiffs from using at any time for any purpose in this litigation any documents in these two categories. Doc.487 at 8. The only exception was publicly available documents. *Id.* Many documents attached to or referenced in the parties' court filings, however, are not publicly available because, e.g., they are sealed or restricted-access documents.

---

[5]It well may be that such disclosures are unduly broad, but in this case all the parties, including Denver, made the same broad disclosures. *See* Doc.483-1 at 3 (Denver's disclosure: "[a]ll Bates stamped documents and other items produced by defendants or by plaintiffs").

The indiscriminate and sweeping bar is unwarranted. In its motion to strike, not even Denver mustered any argument suggesting that Plaintiffs should be barred from using any document. Further, Denver and Plaintiffs prior to November 2011 *timely* produced tens of thousands of pages of documents, more than 2,000 of which were used in the pending summary judgment proceeding.

The bar preventing use of any documents effectively terminates Plaintiffs' lawsuit. The sweeping and drastic sanction was error.

## II. The Magistrate Judge erred in determining that the individuals identified by name in the Fourth Supplemental Disclosures were improperly disclosed.

The Fourth Supplemental Disclosures identified by name 108 individuals and the "Denver Manager of Safety." Doc.447 at [1]-15 ¶¶ A.1-108. It also identified three categories of individuals: all deposed individuals; all Denver law enforcement officers and employees who participated in the mistaken identity arrest/detention of plaintiffs; and all individuals identified in depositions. *Id.* at 15 ¶¶ A.110-115.

Denver's Motion to Strike unhelpfully failed to state which individuals were the subject of the motion. Instead, it argued for exclusion "from use in the pending [Rule 56 proceeding]" and "from use in subsequent proceedings" all "*previously undisclosed* witnesses and documents." Doc.451 at 1 (emphasis supplied).

The motion left to Plaintiffs and the Court the burden of determining *which* witnesses and documents Denver was claiming was "previously undisclosed." In our response, we said that on its face such a Rule 37 motion—that failed to identify the Rule 26(a)(1)(A) violation—was unfair, and gave examples of individuals identified in the Fourth Supplemental Disclosures who previously had been disclosed. Doc.483 at 11. Plaintiffs believed it was Denver's burden to identify specifically which of the disclosed individuals it was complaining about.

In its reply, Denver ignored our contention of unfairness. While acknowledging we had correctly identified individuals in the Disclosures who previously had been disclosed, Denver made no effort to identify which other individuals it contended had not been disclosed previously. *See, e.g.,* Doc.486 at 4 (argument by Denver that it had not received "fair notice" of "over 100 specific witnesses").

The Magistrate Judge implicitly rejected our contention that the motion unfairly placed on Plaintiffs and the Court the burden of determining which witnesses and documents previously were undisclosed. *See* Doc.487 at 2, 8. The Magistrate Judge did not address the contention. Nor did the Magistrate Judge address the disclosed individuals specifically.

Page 3 of the Order states—incorrectly—that the Fourth Supplemental Disclosures identified "108 witnesses." On page 8, the Order states—incorrectly—that Plaintiffs in their response to the motion to strike "assert that the majority of the 108 witnesses listed in the Fourth Supplemental Disclosures" was revealed in Denver's own documents. On the contrary, we did not say the Disclosures identified 108 witnesses. *See* Doc.483. Otherwise in the Order, however, the Magistrate Judge did not distinguish between the "108 witnesses" and the other individuals who were disclosed as part of a category. *See, e.g.,* Doc.487 at 4 ("many of the witnesses identified in the Fourth Supplemental Disclosures"); *id.* (stating that Denver lacked knowledge a specific person would be relied on as "a fact witness"); *id.* ("Plaintiffs had the documents from which these witnesses were identified"); *id.* (finding "significant number of witnesses" disclosed); *id.* at 5 (stating that Denver has not had opportunity "to investigate the evidence related to the witnesses who are listed in the Fourth Supplemental Disclosures").

On page 8, the Order bars Plaintiffs "from utilizing *the witnesses or documents identified in the Fourth Supplemental Disclosures*" (emphasis supplied), with the exception of three "witnesses" and matters of public record.

The Order fails to justify the blanket prohibition of all individuals and documents identified in the Fourth Supplemental Disclosures. It referenced only

"108 witnesses" and four documents (affidavits), but barred Plaintiffs from "utilizing" any of the witnesses or documents for any purpose at any time.

Because of the blanket prohibition, we address all of the excluded individuals. They consist of these categories: 100 named individuals believed to have information about a specific mistaken identity arrest and/or detention ; nine individuals (named or identified by title) who are current or former Denver officials or employees; all deposed individuals; all Denver officers and employees who participated in the arrest and detention of any of the original plaintiffs and intervenor in this action; and all individuals identified in depositions.

For purposes of this Objection, we assume Denver claims that none of the individuals in the Fourth Supplemental Disclosures was previously disclosed, except for the two as to whom Denver withdrew its objection. *See* Doc.486 at 7.[6]

**A. All 100 individuals with knowledge of specific mistaken identity arrest and detention were timely disclosed by Denver and/or re-disclosed by Plaintiffs well before November 2011.**

**1. Summary.**

Denver's claim that the disclosures were untimely and that it did not receive "fair notice" of the 100 individuals is wrong, at best. Denver *created documents* in

---

[6]Denver withdrew its objection to the Fourth Supplemental Disclosures' disclosure of Gerald Whitman, Richard Rosenthal and Ruth Tafoya. Mr. Whitman was not listed by name in the Fourth Supplemental Disclosures.

response to Plaintiffs' specific discovery requests—backed up by a court order compelling responses to the requests—to identify victims of mistaken identity arrest and detention. It *disclosed* those documents to Plaintiffs. Eighty-seven individuals identified in the Fourth Supplemental Disclosures also were specifically identified by name in those documents. Within days, Plaintiffs' counsel began *re-disclosing* those names to Denver. The remaining thirteen names were disclosed by Plaintiffs or Denver during the period February 2009-February 2010.

*Each one* of the 100 victims of mistaken identity arrest and detention was disclosed by Denver or Plaintiffs by 2010 as part of "the discovery process or in writing," Fed. R. Civ. P. 26(e)(1)(A). Accordingly, the 100 victims were timely disclosed, and their re-disclosure in the Fourth Supplemental Disclosures cannot be untimely as a matter of law.

### 2. Relevant facts.

In October 2008, Plaintiffs began requesting information relating to their § 1983 *Monell*[7] claim. A key discovery area was Denver's mistaken identity arrests and detentions of non-parties. Interrogatory No. 12, for example, required Denver to "[d]escribe any mistaken arrest or mistaken detention carried out by Denver law

---

[7] *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658 (1978).

enforcement agencies—by providing the *identity* of the innocent person, the date of the mistaken arrest, and the identity of the arresting officer." Doc.459-12 at 13 (emphasis supplied).[8]

It quickly became clear Denver had no idea how many innocent persons it had arrested and detained based on mistaken identity, because it did not collect data on or otherwise track mistaken-identity arrests and detentions. *See* Doc.454 at 42-45. In response to Interrogatory No. 12, for example, Denver identified ten individuals. Of these ten, seven already had been identified by Plaintiffs in the original Complaint. *See* Doc.459-12 at 13. Asked whether it had a policy for collecting data on mistaken-identity arrests and detentions, Denver answered that it did not. *See id.* at 14.

### a. Denver itself disclosed to Plaintiffs 95 of the 100 victims of mistaken identity arrest and detention named in the Fourth Supplemental Disclosures.

The Fourth Supplemental Disclosures discloses the identities of 100 victims of mistaken identity arrest and detention. Denver itself had disclosed *to Plaintiffs*

---

[8]*See id.* at 12 (Interrog. No. 23: requiring identification of all documents relating to Denver's discovery responses); *id.* (Req. for Prod. No. 1: requiring production of any document identified in Interrog. No. 23).

All references to page numbers in ECF documents are to the parties' page numbers and not the ECF-generated page numbers.

the identities of 95 of the 100 victims up to ten months before the Fourth

Supplemental Disclosures was served.

Denver's disclosures came in three groups: Three victims were disclosed in

the period August-September 2009. Eighty-seven were disclosed in September-

October 2009. Five were disclosed in January-February 2010.

**Denver's disclosure of three of the 100 individuals**. In early 2009, many

months after Plaintiffs commenced this action, the Denver Sheriff Department

finally began tracking occasions when inmates made certain assertions indicating

they believed they had been the victim of mistaken identity arrest and/or detention.

Such assertions would trigger a so-called "Prisoner Identity In Question," or PIIQ,

investigation. *See generally* Doc.454-1 at 84-85. The investigations triggered the

use of a form that would document the efforts undertaken by Denver to determine

whether the inmates' assertions were correct. The form included this information:

the inmate's name, birthdate, booking number, and various identification numbers;

the name of the person named in the warrant along with the person's birthdate,

booking number, and various identification numbers; and a finding whether the

inmate's assertion was correct. *See, e.g.,* Doc.400-1 at 15-16. If Denver determined

the inmate was right, Denver would drop the charge causing the inmate to be

detained. On each such occasion, the PIIQ form constituted evidence (an

admission) of a mistaken identity arrest and/or detention. In response to Plaintiffs' discovery requests (*see, e.g.,* Doc.459-12 at 13), Denver disclosed numerous completed PIIQ forms.

Among the PIIQ forms Denver disclosed to Plaintiffs were those identifying the following individuals named in the Fourth Supplemental Disclosures: Jamie Amaro-DeLeon (Fourth Supplemental Disclosures ¶ A.3); Nathaniel A. Johnson (¶ 49); and Willie Lay (¶ 53). The PIIQ forms are attached as EXHIBIT 14, and were disclosed to Plaintiffs on August 17, 2009, and September 22, 2009.

**Denver's disclosure of an additional 87 individuals.** Despite Denver's failure to produce information on non-party victims of mistaken identity arrest and detention, Plaintiffs' counsel continued to believe based on anecdotal information that Denver had a custom of arresting and detaining individuals based on mistaken identification. In conferral and in discovery responses, Denver took the position that if information about such arrests existed, it had no ability to retrieve the information without undertaking extraordinary and unduly burdensome efforts because, e.g., the responsive documents were non-computerized paper documents that would have to be searched by hand. *See* Doc.459-12 at 15 (Denver's discovery response).

By June 2009, shortly before discovery cut-off, Denver had produced little information in response to Plaintiffs' discovery requests for information on non-party mistaken identity arrests and detentions. Plaintiffs' counsel Taylor Pendergrass conceived of a method using keywords and phrases that Denver could use to search certain electronic records to identify a subset[9] of victims of mistaken identity arrests and detentions by Denver. Despite numerous requests over a lengthy conferral period, however, Denver declined to conduct this electronic search.

Plaintiffs requested judicial intervention. In September 2009, the Court ordered Denver to conduct the electronic search and produce the information. Doc.281. Thereafter, pursuant to the order, Denver conducted the search using 23 keywords and phrases[10] supplied by Mr. Pendergrass.

On September 22, 2009, Denver produced a document titled "FourHorn Litigation Minutes" generated from its electronic search. *See* EXHIBIT 15 (Bates-numbered Fourhorn General 003205-27). In this Objection, we refer to the document as "**Denver Search Results #1**." The document confirmed two things:

---

[9]Plaintiffs' counsel recognized that a search of keywords and phrases deduced to be indicative of a finding by a Denver County Court judge of a mistaken identity arrest and detention would not identify all such arrests and detentions carried out by Denver.

[10]*See, e.g.,* Doc.458, Ex.21, at 4481.

one, Plaintiffs had correctly believed there were large numbers of victims of mistaken identity arrest and detention by Denver; two, the keyword and phrases search could, in fact, identify specific cases of mistaken identity arrest and detention. For example, on the first page of Denver Search Results #1 is a minute order entry stating, "Wrong defendant brought into court. Jamie Milner is a female. The defendant Jamie Sandoval is male." *Id.* at Fourhorn General 003205. Ms. Milner was disclosed by name in the Fourth Supplemental Disclosures. Doc.447 at 9 ¶ 66.

In October 2009, Denver produced a second document generated from its electronic search. This document also was titled "Fourhorn Litigation Minutes." *See* Doc.458, Ex.21 (Bates-numbered Fourhorn General 004489-504). We refer to this document as **Denver Search Results #2**. This document appears to contain more minute order entries and to identify more victims of mistaken identity arrest and detention than Denver Search Results #1. For example, in Denver Search Results #2, Juan Jose Sous Flores is identified as a victim of mistaken identity arrest and detention. *See* Doc.448, Ex.21 at Fourhorn General 004481. In Denver Search Results #1, his name does not appear.

Eighty-seven victims of mistaken identity arrest and detention were disclosed by name in September and October 2009 *by Denver* in Search Results ##1 & 2.

**Denver's disclosure of an additional five victims.** Denver disclosed an additional five victims of mistaken identity arrest and detention: Leniqua Brown, Edwardo Hernandez-Flores, DeAngelo Horton, Dwight David Jones, and SLR.[11]

Denver Search Results ##1 & 2 identified **Leniqua Brown** as a victim of mistaken identity arrest and detention, but listed her only as a "Ms. Brown." *See* EXHIBIT 15, at Fourhorn General 003206 (Case No. 00M11652, Mar. 19, 2002); Doc. 458-21, at Fourhorn General 004482 (same). After Plaintiffs requested disclosure of documents relating to Case No. 00M11652, Denver on January 15, 2010, produced a document identifying her as "Leniqua Quiana Brown." *See* EXHIBIT 16.

Denver Search Results ##1 & 2 identified **Edward Hernandez-Flores** as a victim of mistaken identity arrest and detention, but referenced him only as "wrong person in custody" and "wrong defendant." *See* EXHIBIT 15, at Fourhorn General 003215 (Case No. 06GS944351, Aug. 16, 2006 & Mar. 21, 2007); Doc. 458-21, at

---

[11]It is our understanding that there may be a Denver District Court order that may limit the disclosure of SLR's name in connection with the criminal case in which he was mistakenly arrested. So we refer to him only by his initials.

Fourhorn General 004490 (same). After Plaintiffs requested disclosure of documents relating to Case No. 06GS944351, Denver on October 22, 2009, produced a document identifying him as "Edward Hernandez-Flores." *See* EXHIBIT 17.

Denver Search Results ##1 & 2 identified **DeAngelo Horton** as a victim of mistaken identity arrest and detention, but referenced him only as "wrong defendant." *See* EXHIBIT 15, at Fourhorn General 003219 (Case No. 98M10166, Dec. 20, 2002); Doc. 458-21, at Fourhorn General 004495 (same). After Plaintiffs requested disclosure of documents relating to Case No. 98M10166, Denver on November 12, 2009, produced a document identifying him as "DeAngelo Horton." *See* EXHIBIT 18.

Denver Search Results ##1 & 2 identified **Dwight David Jones** as a victim of mistaken identity arrest and detention, but referenced him only as "wrong defendant." *See* EXHIBIT 15, at Fourhorn General 003224-25 (Case No. B530514, Apr. 17, 2008); Doc. 458-21, at Fourhorn General 004501 (same). After Plaintiffs requested disclosure of documents relating to Case No. B530514, Denver on February 12, 2010, produced a document identifying him as "Dwight David Jones." *See* EXHIBIT 19.

Denver Search Results ##1 & 2 identified **SLR** as a victim of mistaken identity arrest and detention, but referenced him only as "not [the] correct person." *See* EXHIBIT 15, at Fourhorn General 003214 (Case No. 05M6894, Sept. 25, 2007); Doc. 458-21, at Fourhorn General 004490 (same). After Plaintiffs requested disclosure of documents relating to Case No. 05M6894, Denver on October 23, 2009 and in February 2010 produced documents identifying him as SLR.[12]

> ### b. Plaintiffs disclosed and/or re-disclosed to Denver 83 victims of mistaken identity arrest and detention identified in the Fourth Supplemental Disclosures.

**Plaintiffs' disclosure of three victims.** On May 27 and June 2, 2009, Plaintiffs served on Denver two Rule 30(b)(6) notices. One of the matters listed in the notices was the circumstances of the mistaken identity arrest and/or detention of a number of individuals identified in a May 24 *Denver Post* article. The notices attached the *Post* article as an exhibit. *See* EXHIBIT 7, at 5 & attach. Three names in the Fourth Supplemental Disclosures came from the notices and attached article: Luiz Manuel Carlos, Chris Pete Lechner, and Keith Raymond Mitchell. *See id.* attach.

---

[12]Plaintiffs do not reproduce those documents here for the reason indicated in footnote 11, above. In the event Denver disputes the facts regarding SLR, Plaintiffs will produce the documents in their reply.

**Plaintiffs' disclosure/re-disclosure of 83 of the 100 victims.** During the period 2009-2010, Plaintiffs disclosed and/or re-disclosed to Denver 83(including the three disclosed in the Rule 30(b)(6) notices) of the 100 victims identified by name in the Fourth Supplemental Disclosures. These disclosures/re-disclosures occurred during the discovery process and in writing, in the form of a multitude of discovery-conferral letters sent by Mr. Pendergrass to Denver's counsel. The letters in which victims were specifically disclosed are as follows:

| Date | Exhibit |
|---|---|
| 5/28/09 | EXHIBIT 1 |
| 5/29/09 | EXHIBIT 2 |
| 7/15/09 | EXHIBIT 23 |
| 7/17/09 | EXHIBIT 26 |
| 8/14/09 | EXHIBIT 21 |
| 9/9/09 | EXHIBIT 12 |
| 9/29/09 | EXHIBIT 13 |
| 12/4/09 | EXHIBIT 20 |
| 1/5/10 | EXHIBIT 28 |
| 2/1/10 | EXHIBIT 27 |

EXHIBIT 8 is a chart that lists each individual disclosed in the Fourth Supplemental Disclosures (along with the Supplemental Disclosures' paragraph number in which he or she is identified), the name of the individual, and the date of the Pendergrass letter in which he or she was disclosed. Mr. Pendergrass disclosed and/or re-disclosed each victim of mistaken identity arrest and detention identified in the Fourth Supplemental Disclosures, with the exception of fifteen such victims.

Some of the victims were disclosed/re-disclosed multiple times over a period of months.

Beginning in May 2009, Plaintiffs wrote a series of letters to Denver to confer on discovery issues. The letters made it clear that Plaintiffs were seeking the identity of victims of mistaken identity arrest and detention by Denver, along with related information about the arrests/detentions. In these letters, Plaintiffs disclosed a significant quantity of information about potential victims to help Denver locate and retrieve the information necessary to comply with its disclosure and discovery obligations. This information included the re-disclosure of information relating to hundreds of victims of mistaken identity arrest and detention.

**Denver's knowledge of the victims' importance to Plaintiffs'** *Monell* **legal theories.** As discussed above, Plaintiffs propounded specific discovery requests seeking the identity of all non-party victims of mistaken identity arrest and detention by Denver; in response, Denver said it did not track such things and it would be too burdensome for it to try to acquire such information from its records.

In thirteen lengthy and detailed letters sent to Denver's counsel over a period of eight months (May 2009-January 2010), Mr. Pendergrass repeatedly pressed these points (a) Denver had failed to discharge its duty to conduct a good faith

search of its records for the identities of victims of mistaken identity arrest and

detention; (b) Denver had the ability to search its databases using keywords and

phrases to find the identities of these victims; and (c) the identities of these victims

was critical to Plaintiffs' *Monell* theory that Denver had engaged in a custom of

carrying out and ignoring mistaken identity arrests and detentions. The letters are

attached as exhibits to this Objection:

| | |
|---|---|
| 5/28/09 | EXHIBIT 1 |
| 5/29/09 | EXHIBIT 2 |
| 6/2/09 | EXHIBIT 3 |
| 6/23/09 | EXHIBIT 4 |
| 7/3/09 | EXHIBIT 5 |
| 8/14/09 | EXHIBIT 21 |
| 9/29/09 | EXHIBIT 13 |
| 10/22/09 | EXHIBIT 25 |

In the letter dated May 28, 2009, Mr. Pendergrass expressed frustration over

Denver's claim that it had no further information on the identities of victims of

mistaken identity arrest and detention:

> [T]he list of mistaken identity arrestees/victims has continued to grow.
> Most recently, on May 25, 2009, the names of five newly uncovered
> and recent mistaken identity victims were disclosed in a *Denver Post*
> article . . . .

> As more and more mistaken identity incidents/arrests have been
> uncovered, it is quite clear that Denver's response/production to
> interrogatories seeking information on incidents of mistaken identity
> is far from complete.

EXHIBIT 1, at 2. Mr. Pendergrass directly requested the identities of victims of

mistaken identity arrest and detention contained in Denver County Court

databases:

> *The parties are aware that court records often contain critical
> mistaken identity information*. . . . Denver's responses to
> [i]nterrogatories . . . do not . . . describe the efforts undertaken to
> search any court records other than "wrong person clears" for
> mistaken identity information, as required by Interrogatory No. 22 and
> [the discovery rules]. *Does the Denver County Court maintain a
> database(s) which includes . . . minute orders* and/or records of other
> actions . . .? If such a search is possible but has not been undertaken,
> please produce all Denver County Court records containing any
> keywords which judges or clerks use to indicate a mistaken identity
> arrest or detention . . . .

*Id.* at 5 (emphasis supplied).

In a letter dated May 29, 2009, Mr. Pendergrass disclosed a victim of

mistaken identity arrest and detention, Enia Richardson, and attached Denver law

enforcement documents relating to arrest. The documents contained her full name,

DOB and DPD number. Also attached were documents relating to the suspect with

whom Ms. Richardson had been confused. Mr. Pendergrass stated: "Undoubtedly,

the same or similar records exist for the dozens of other identified incidents of

mistaken arrest/detention for which Denver has yet to produce any meaningful

response." *Id.*

In a letter dated June 2, 2009, Mr. Pendergrass sent a letter to Denver's counsel extensively detailing how Warrant Verification Logs[13] could be used to locate victims of mistaken identity arrests and detentions. He requested that Denver produce additional documents that would allow Plaintiffs to use the Logs to identify victims of mistaken identity arrests and detentions. EXHIBIT 3, at [1]-4. In an email dated June 14, 2009, Denver rejected the request, stating:

> Searches cannot be performed database-wide because of the differences in the situations and the structure and purpose of the databases . . . Denver cannot search for the Plaintiffs' definition of 'mistaken identity' circumstances in its computer databases.

EXHIBIT 25, at 5.

In a letter dated June 23, 2009, Mr. Pendergrass rejected Denver's counsel's argument that Denver could not produce the identities of mistaken-identity victims:

> There is little question that *each and every mistaken identity arrest/detention is relevant to Plaintiffs' claims* and as such, discoverable. [If Denver documents hypothetically showed 100 non-plaintiff mistaken identity arrest and detention], Plaintiffs may try to show that these 100 mistaken identity arrests/detentions are evidence of Denver's policy, practice or custom of failing to prevent, identify and remedy mistaken identity arrests/detentions. . . . *Denver's refusal to comply with Plaintiffs' well-explained and targeted requests for records and information identifying mistaken identity arrests/detentions* . . . based only upon defendants' allegedly dim

---

[13]Warrant Verification Logs are Denver County Court documents that can provide clues about occasions when law enforcement agencies have mistakenly arrested or detained a suspect on a warrant issued by the Denver County Court. *See generally* Doc.454-1 at 71-72.

> view of Plaintiffs' claim, is a patently unsupportable read of . . .
> defendants' discovery and disclosure obligations.

EXHIBIT 4, at 2 (emphasis supplied).

The first eight pages of Mr. Pendergrass's July 3, 2009, letter to Denver's counsel contained an extensive discussion of Plaintiffs' intent to require Denver to identify all victims of mistaken identity arrests and detentions by Denver and to produce all records relating to them. The letter identified numerous ways in which Denver could identify such victims and locate such records. *See* EXHIBIT 5, at [1]-8.

In a letter dated August 14, 2009, Mr. Pendergrass identified numerous, continuing deficiencies in discovery responses, and suggested that Denver had not conducted a good-faith search of Denver County Court's database. He also documented Denver's repeated intransigence in producing Denver County Court records that would identify "non-plaintiff mistaken identity arrests/detentions." EXHIBIT 21 at 5, 8.

On September 29, 2009, seven days after Denver disclosed Denver Search Results #1, Mr. Pendergrass sent a letter to Denver's counsel relating to the search result. EXHIBIT 13. The letter was written pursuant to the Court's September 3, 2009, discovery order. The order stated that after Denver conducted its electronic search and produced a "computer-generated list as a result of such search,"

Plaintiffs "shall identify specific documents to be produced from that list." Doc.281 at 3.

In the letter, Mr. Pendergrass made a highly detailed request for documents relating to the individuals identified (by name or otherwise) in Search Results #1. He said that although Search Results #1 returned 700 minute orders, he had exercised caution and discretion in selecting only those minute orders that "clearly" related to a mistaken identity arrest and detention.[14] EXHIBIT 13, at 2.

The September 29 letter disclosed the identities of—or as much information as Plaintiffs had about—237 individuals believed to be victims of mistaken identity arrest and detention by Denver. To help Denver locate documents relating to these 237 individuals, Mr. Pendergrass provided extraordinary detail. For example, for the first individual listed, Mr. Pendergrass noted that the minute order did not provide the name of the mistakenly arrested individual. Nevertheless, Mr. Pendergrass provided Denver with the following information to help it locate responsive documents: the three Denver County Court case numbers associated with the warrants pursuant to which the mistakenly arrested individual was arrested; the date and time the arrest occurred; the date and time of the in-custody

---

[14]Plaintiffs ultimately identified 503 cases in which Denver had mistakenly arrested or detained the wrong person. *See* Doc.454 at 42.

hearing; the action by the court; the date of the minute order; the relevant

substance of the court's minute order finding that the individual had been

mistakenly arrested; and the page number of Search Results #1 on which the

minute order could be found. *See id.* Attach., No. 1.

In a letter dated October 22, 2009, Mr. Pendergrass argued that Denver was

breaching its discovery duties by refusing to produce court records, arrest records

and detention records relating to (a) victims who were identified by name in the

Denver County Court minute orders, and (b) victims who were identified

incompletely ("Ms. Brown") or not at all ("wrong defendant arrested again").

EXHIBIT 25, at 2. Mr. Pendergrass further stated:

> The frequency of mistaken identity arrests caused by Denver's law
> enforcement agencies is central to Plaintiffs' *Monell* claims. The
> subject matter of this case—the incarceration of totally innocent
> persons by Denver—is of the highest public importance. . . .
>
> . . . . In this case, the frequency with which Denver's law enforcement
> agencies arrest innocent persons in cases of mistaken identity, the
> circumstances of those arrests, and what Denver does or does not do
> in response, is evidence that goes to the very heart of Plaintiffs'
> *Monell* claims.

*Id.* at 3 (footnote omitted).

Finally, Mr. Pendergrass rejected Denver's argument that production of

documents relating to mistaken identity arrests and detentions was "cumulative":

"The records related to the 237 newly identified mistaken identity arrests are

clearly not cumulative or duplicative. Other than a single minute order entry revealing that a Denver [County Court judge] found in a judicial proceeding that an innocent person was mistakenly arrested, *Plaintiffs have no other evidence or information about these cases.*" *Id.* at 8 (emphasis supplied).

### 3. All 100 victims of mistaken identity arrest and detention by Denver were timely disclosed, by Denver and/or by Plaintiffs.

Rule 26(e) disposes of any contention that the disclosure of the 100 victims of mistaken identity arrest and detention in the Fourth Supplemental Disclosures was untimely.

Subdivision (e) provides that a party has *no duty* to supplement its initial disclosures "if the additional . . . information has . . . otherwise been made known to the other parties *during the discovery process or in writing*" (emphasis supplied). The Advisory Committee Notes on subdivision (e) are in accord: "There is . . . no obligation to provide supplemental . . . information that has been otherwise made known to the parties in writing or during the discovery process, *as when a witness not previously disclosed is identified during the taking of a deposition.*" Fed. R. Civ. P. 26, Notes on Advisory Comm. on Rules–1993 Amendment (emphasis supplied).

Notably, in applying subdivision (e)(1)(A) of Rule 26, the Magistrate Judge cited the first half requiring supplementation. But the Magistrate Judge did not

address the second half providing that no duty of supplementation arises when an individual becomes known to the parties "during the discovery process or in writing." *See* Doc.487 at 3. The Magistrate Judge did not cite the Rule 26 Advisory Committee Notes.

In this case, as discussed in Section II.A.2 of this Objection, every one of the 100 individuals believed to be victims of mistaken identity arrest and detention by Denver had been disclosed—sometimes more than once—during the discovery process *and* in writing. The vast majority of these 100 individuals was disclosed by *both* Denver and Plaintiffs.

Denver's disclosures, including its disclosures in Denver Search Results ##1 & 2, were the direct product of Plaintiffs' discovery requests, backed up by this Court's September 2009 order compelling responses to the requests. The discovery requests specifically requested the "*identity*" of all victims of mistaken identity arrest and detention by Denver. Doc.459-12 at 13. Both search results were responsive to that request. *A fortiori,* following Denver's disclosure of Denver Search Results #1 and Denver Search Results #2, neither Plaintiffs nor Denver were under any duty to disclose again the names in the search results. That Plaintiffs *re-disclosed* these individuals in 2009, 2010 and in the Fourth Supplemental Disclosures in November 2011 changes nothing.

The Magistrate Judge determined that a finding that Denver had "fair notice" of the 100 victims of mistaken identity arrest and detention "would require the Court to attribute an uncanny level of prescience to [Denver]." Doc.487 at 4. This determination misapprehends the facts.

These names were not drawn from many thousands of pages of undifferentiated or dissociated documents randomly produced by Denver.[15] They appeared in a focused context where it was unmistakably clear that they were victims of mistaken identity arrests, and Plaintiffs intended to rely on a pattern of such arrests in support of their *Monell* theories for relief. The names were drawn principally from two overlapping documents—Denver Search Results ##1 & 2— *created by Denver* for the sole purposes of (a) responding to specific discovery requests seeking the identities of non-party victims of mistaken identity arrest and

---

[15]It is worth noting that Rule 26 imposes no duty upon a plaintiff, after receiving thousands of pages of documents in discovery *from its opponent*, to review the documents within some arbitrary time frame to identify individuals named in the documents and determine whether these individuals "likely . . . have discoverable information" that will be used to support the plaintiff's claims. *See* Charles W. Sorenson, Jr., *Disclosure Under Federal Rule of Civil Procedure 26(a)—"Much Ado About Nothing?",* 46 Hastings L.J. 679, 745-46 (1995) ("the supplementation requirement creates a duty to disclose information, but should not create any new duty of inquiry or investigation that would not already be demanded by ethical obligations to the client, other Civil Rules, or malpractice avoidance"). Nothing in Rule 26 bars a plaintiff from awaiting the filing of a summary judgment motion to begin the task of preparing a response, including the preliminary or final review of documents previously disclosed by its opponent.

detention by Denver, and (b) complying with a court order compelling responses to those specific discovery requests. In those cases where the search results identified a mistaken identity arrest without providing the name of the victim, the names also were drawn from subsequently-produced Denver documents that related to those victims' mistaken identity arrest and detention. The documents were specifically produced by Denver—after its creation of Search Results ##1 & 2—pursuant to this Court's September 2009 Order. *See* EXHIBIT 15, at [1]-2. It is noteworthy that when Denver produced arrest records and other documents relating to the mistaken identity arrests and detentions, it did so in response to Mr. Pendergrass's letters that specifically identified by victim name, case number and other information specific to an arrest/detention.

### 4. The Magistrate incorrectly ruled that Plaintiffs were required to disclose "fact witnesses."

Adopting Denver's argument, the Magistrate Judge made another serious error: The Magistrate Judge conflated the disclosure of "*individual[s]* likely to have discoverable information"[16] with the disclosure of "*fact witnesses.*" *See, e.g.,* Doc.487 at 4 (stating that Plaintiffs "did not disclose the names of these fact witnesses until November 2011").

---

[16]Fed. R. Civ. P. 26(a)(1)(A)(ii) (emphasis supplied).

Rule 26 creates a comprehensive, pretrial disclosure regime. Three types of disclosures are required. Subdivision (a)(1) requires "Initial Disclosure[s]" of "*individual[s]*"—not witnesses—who the party believes are likely to have discoverable information. Subdivision (a)(2) requires "expert disclosures." And Subdivision (a)(3) requires "Pretrial Disclosures" of "*witnesses*" who are expected to testify and who may testify.

Subdivision (a)(1)(A)(i) "individuals" are different from subdivision (a)(3) "witnesses." As the District Court stated in *Phillip M. Adams & Assocs., LLC v. Winbond Elec. Corp.,* 2010 WL 3239331, at *1 (D. Utah Aug. 16, 2010), subdivisions (a)(1) and subdivision (a)(3) "serve different purposes." The purpose of (a)(1) "is to identify at the outset those <u>*persons*</u> that may have any information relevant to the case *in order to allow for a complete investigation by all parties.*" 2010 WL 3239331, at *1 (emphasis altered). On the other hand, the purpose of (a)(3) "is to list, *after all the information has been gathered and discovery is closed*, the <u>*witnesses*</u> who will be called by a party at trial." *Id.* (emphasis supplied).

The Magistrate Judge accepted Denver's argument conflating Plaintiffs' subdivision (a)(1)(A)(i) duty with its not-yet-ripe subdivision (a)(3) duty: "The Court agrees with [Denver] that knowledge of the *existence of a person* is

distinctly different from knowledge that *the person will be relied on as a fact witness*." Doc.487 at 4 (emphasis supplied). Knowledge of the "existence of a person" who may have information supportive of a plaintiff's claim is, indeed, different from knowledge that "the person will be relied on as a fact witness." Knowledge of the first type is what the plaintiff must reveal under subdivision (a)(1)(A)(i) as an *initial disclosure*. Knowledge of the second type is what the plaintiff must reveal much later——"30 days before trial"—under subdivision (a)(3) as a *pretrial disclosure*.

The Magistrate Judge's conflation of the two types of disclosures is exemplified by her finding that Denver's own disclosure of the victims of mistaken identity arrest and detention—from documents Denver produced—did not give Denver "fair notice of the witnesses." Doc.487 at 4. It did not do so, the Magistrate Judge concluded, because notice of this type would require the defendant to have an "uncanny level of prescience" to realize that the disclosed individual "will be relied on as a fact witness." *Id.*

The Magistrate Judge's conflation of the two types of disclosures resulted in her imposition upon Plaintiffs of a duty nowhere found in subdivision (a)(1)(A)(i). It also resulted in the Magistrate Judge's failure to appreciate the significance of the disclosure—by either party—of an individual thought to have discoverable

information supportive of Plaintiffs' claims. Once Denver has knowledge of such an individual, no "prescience" is needed by Denver at all about the possible future *use* of the information. So long as it knows of the individual and his or her relevant information—here, information about the fact of and circumstances of his or her mistaken identity arrest and detention—the purpose of subdivision (a)(1)(A)(i) has been achieved. This is because the rule requires nothing more than the disclosure of an individual likely to have discoverable information that the plaintiff "*may* use to support its claims." The disclosure says nothing—and the plaintiff has no duty to say anything—about whether the information the disclosed individual is thought to have *will* be used to support a claim.

As support for its ruling that Plaintiffs owed a duty to disclose specific "fact witnesses," the Order cites *Gallegos v. Swift & Co.*, 2007 WL 214416 (D. Colo. Jan. 25, 2007), *cited in* Mot. to Strike, Doc.486 at 4. Doc.487 at 4. The Order states that the *Gallegos* court "reject[ed] plaintiff's argument that defendant was on notice of certain witnesses identified in an untimely disclosure because the names of the witnesses were obtained from defendant's own document production." *Id.*; *see* Doc.486 at 4 (Denver's citation to *Gallegos* for similar proposition).

*Gallegos* is off-point. In that Americans with Disability Act case, the defendant Swift & Company propounded an interrogatory requiring plaintiffs to

identify each job at Swift they could perform with accommodation. Swift had disclosed to the plaintiffs each of the many positions available at Swift and the physical requirements of each position. Plaintiffs answered the interrogatory.

Ten months after discovery cut-off and less than three months before trial, plaintiffs served an amended answer. In it, the plaintiffs asserted an additional 283-922 new positions they could perform with accommodation. Defending a motion to exclude the plaintiffs' assertion of these new jobs they could perform, the plaintiffs argued in part that the new positions were "derived from documents disclosed by Swift." 2007 WL 214416, at *3.

The District Court ordered the information excluded. It noted that "the relevant inquiry is not whether Swift was in some abstract way aware that these positions existed"; instead, the question was whether an individual plaintiff asserts he or she was able to perform a specific job. *Id.* It held that "Swift's disclosure of the broad universe of potential positions to plaintiffs does not place Swift on notice of which specific positions each individual plaintiff considered him or herself able to perform." *Id.*

*Gallegos* is easily distinguishable. Contrary to Denver's motion to strike papers and the Magistrate Judge's statements, *Gallegos* does not concern and does not discuss the disclosure of "individuals" or "fact witnesses."

Nor do the *Gallegos* facts support Denver's or the Magistrate Judge's analysis. Swift unquestionably was aware of each position available at its facility. It disclosed each such position to the *Gallegos* plaintiffs. However, Swift's interrogatory required the plaintiffs to disclose *which of the hundreds of positions* they could perform. It seems obvious that Rule 26(e) would not permit the plaintiffs to answer, for example, that they could perform 30 positions, and then years later and three months before trial, amend the answer to say they could perform 283 or 922 *additional* positions. The prejudice to Swift is obvious. The *Gallegos* plaintiffs' position would be equivalent, in the case at bar, to Denver's identification, for example, of all 700,000 persons arrested by Denver during the period 2002-2009, and Plaintiffs' claiming that Denver had notice of the 500 persons whom Plaintiffs had learned independently of Denver were victims of mistaken identity arrest and detention by Denver. Just as Swift would have no idea which positions the *Gallegos* plaintiffs believed they could perform, in this example Denver would have no idea which of the 7,000 arrestees Plaintiffs had determined, independently of Denver, were victims of mistaken identity arrest and detention.

Additionally, the *Gallegos* plaintiffs' knowledge of what positions they were capable of performing was solely in their possession, rendering their failure

45

to disclose such knowledge highly prejudicial to the Swift. Here, however, by February 2010, Plaintiffs' and Denver's Rule 26(a)(1) knowledge—identity of the individuals likely to have information and the subjects of that information—was identical as to the 100 victims named in the Fourth Supplemental Disclosures.

*Gallegos* is in accord with our position on Rule 26(a)(1)(A)(i) and (e). Unlike in *Gallegos*, Plaintiffs are not claiming Denver is charged with notice of the "universe"[17] of arrestees. Instead, Plaintiffs are contending that Denver is charged with notice of all victims of mistaken identity arrest and detention by Denver who were identified by Denver pursuant to its efforts to answer *specific* discovery requests (and court order) *requiring those victims' identification*. It also is charged with notice of Plaintiffs' acute interest in the identity of such victims—because the discovery requests, the court order, and the multitude of letters from Mr. Pendergrass—and of Plaintiffs' intent to use information relating to these victims to support Plaintiffs' *Monell* theories of liability. After complying with Plaintiffs' discovery requests and court order and disclosing the victims' identities, Denver is in no position to claim it lacks notice of those victims until Plaintiffs *re-disclose* the victims to Denver.

---

[17] 2007 WL 214416, at *3.

**5.  The information provided about the 100 victims of mistaken identity arrest and detention complied with Rule 26(a)(1)(A)(i).**

In its motion to strike, Denver argued vaguely that "the Disclosures are inadequate in the information they convey." Doc.451 at 3. It suggested that Plaintiffs provided *no* "useful information" about the individuals that would permit it "to make informed decisions regarding discovery and trial preparation."

The Order focuses on the disclosures of named victims of mistaken identity arrest and detention. It says, correctly, that as to each of these victims, Plaintiffs provided the same information: "Facts relating to arrest based on mistaken identity, including communications to and from law enforcement officers, court proceedings, circumstances of arrest, and length of detention." *E.g.,* Doc.447 at [1] ¶ 1. *See* Doc.487 at 3. The Order concludes that providing such "minimal information" violates Rule 26(e). Doc.487 at 4. This was error.

Subdivision (a)(1)(A)(i) requires that as to each disclosed individual, the party must provide "the subjects" of the discoverable information the disclosed individual may have. The Advisory Committee Notes suggest that nothing elaborate is required: "Indicating briefly the general topics on which such persons have information should not be burdensome, and will assist other parties in deciding which depositions will actually be needed." Fed. R. Civ. P. 26, Notes on Advisory Comm. on Rules–1993 Amendment; *see Sender v. Mann*, 225 F.R.D.

645, 656 (D. Colo. 2004) (stating that disclosures "must be sufficiently detailed to alllow [the non-disclosing party] to make intelligent decisions regarding how [it] will efficiently use the limited number of depositions permitted").

We submit that the subjects provided for each victim of mistaken identity arrest and detention by Denver are sufficient. These subjects may be "generic," Doc.487 at 3, or rote or repetitive, but they accurately summarize the categories of information those victims are believed to have and that Plaintiffs may use to support their claims, e.g., "the facts of their arrest based on mistaken identity" and "communications to and from law enforcement officers." We are hard-pressed to imagine other subjects of information these victims might have that would be relevant to Plaintiffs' claims. Regardless, if discovery had still been open in September 2009 and February 2010 when Denver disclosed these victims—it was not—the identification of those subjects certainly would have helped the parties decide whether to depose the victims. That is all subdivision (a)(1)(A)(i) requires. The Magistrate Judge did not discuss what additional subjects Plaintiffs were required to disclose.

As for the addresses and phone numbers of the 100 victims of mistaken identity arrest and detention, Denver has virtually the same information Plaintiffs have. In our response to the motion to strike, we said we would serve on Denver a

supplemental disclosure providing the contact information we had for a handful of the victims. Doc.483 at 17. We did that ten days later on January 30, 2012. Doc.485. The supplemental disclosure is attached as Exhibit 6. Plaintiffs provided last-known contact information for 42 of the victims of mistaken identity arrest and detention; for 31 of those 42, the last-known contact information was derived from the discovery, e.g., police reports and court records that Denver produced; for another four, the information was obtained from a telephone directory or a combination of discovery and a telephone directory. Denver did not discuss the supplemental disclosure in its reply; nor did the Magistrate Judge in her Order.

> **6. The Magistrate Judge erred in ruling that Denver's ability to depose the victims was impaired by the timing of the November 2011 disclosures.**

The Order's conclusions about violations of subdivisions (a)(1)(A)(i) and (e) and about the appropriate sanction relies heavily on a series of erroneous assumptions:

- Wrong Assumption #1: Denver did not disclose the 100 victims of mistaken identity arrest and detention.

- Wrong Assumption #2: Plaintiffs had a duty to disclose all 100 victims to Denver when Plaintiffs learned of them.

- Wrong Assumption #3: Plaintiffs did not disclose any of the victims before November 2011.

- Wrong Assumption #4: Plaintiffs learned of the victims' identities prior to discovery cut-off.

*See, e.g.,* Doc.487 at 4 ("[Denver] simply did not get a chance to determine how to utilize its allotted discovery regarding the witnesses identified in the Fourth Supplemental Disclosures"). As discussed above in Section II.A.2-5, none of the assumptions is correct.

Discovery cut-off was July 31, 2009. This Court's Order compelling Denver to conduct an electronic search of the minute orders was entered September 3, 2009. Doc.281. Denver did not conduct the search and disclose Search Results #1 until September 22, 2009. It did not disclose Search Results #2 until October 23, 2009. The vast majority (95[18]) of the names of victims of mistaken identity arrest and detention identified in the Fourth Supplemental Disclosures was derived from the two Search Results or PIIQ forms, all of which were received after discovery cut-off. Plaintiffs were aware, before discovery cut-off, of three individuals from whom they obtained affidavits—Messrs. Carlos, Walker and Hernandez.[19] As discussed below, however, the identities of all three were disclosed to Denver well before discovery cut-off. *See* This Objection, at 51-57.

---

[18]As discussed above in § II.A.2, Denver Search Results ##1 & 2 disclosed 87; the search results referenced another five as, e.g., "unknown person," and then Denver subsequently produced documents identifying these five; another three were identified through PIIQ documents.

[19]Plaintiffs also obtained an affidavit from Scott A. Jackson. Mr. Jackson was first disclosed by Denver in Search Results ##1 and 2. *See* This Objection, at 56-57.

Accordingly, as to the three affiants and other victims disclosed by Plaintiffs (e.g., in the 6th Set of Discovery Requests, in Rule 30(b)(6) notices or in discovery-conferral letters) before discovery cut-off, Denver had the opportunity to depose them. As to the remaining victims, who were timely disclosed by Denver or re-disclosed by Plaintiffs after discovery cut-off, neither Denver nor Plaintiffs had an opportunity to depose them.

### B. The four victims who provided affidavits were timely disclosed by Denver and/or Plaintiffs; the Magistrate Judge erred in excluding the four victims and their affidavits.

Of the 100 victims of mistaken identity arrest and detention identified by name in the Fourth Supplemental Disclosures, only four provided affidavits to Plaintiffs. The affidavits were disclosed on November 7, 2011. The four affiants were disclosed well before November 2011 "during the discovery process or in writing," Fed. R. Civ. P. (e)(1)(A).

**Luiz Manuel Carlos** was first identified *by Denver* on April 30, 2009. On that date, Mary Dulacki, a representative of the Office of Manager of the Department of Safety, sent a letter responding to a *Denver Post* reporter's records request. The *Post* reporter requested information about victims of mistaken identity arrest and detention by Denver since 2006. Doc.456-11 at Fourhorn General 011674. Ms. Dulacki identified a number of victims of mistaken identity arrest and detention by Denver, including Luiz Manuel Carlos. *See id.* at Fourhorn General

011675. She stated that Mr. Carlos was arrested on a warrant for Alberto Xolapa-Balanzario. Denver released him on February 21, 2009, after Denver "confirmed" that he was not the person named on the warrant. *Id.* Although Denver sent the letter on April 30, 2009, when discovery was still open, it did not produce the letter to Plaintiffs until March 26, 2010.

On May 24, 2009, the *Denver Post* published an article identifying a number of victims of mistaken identity arrest and detention, including Luiz Manuel Carlos. EXHIBIT 9, Ex.A.

On May 27, 2009, and June 2, 2009, Plaintiffs served two Rule 30(b)(6) notices on Denver. *Id.* (June 2, 2009, notice). Attached as Exhibit A to the notices was the *Post* article. One of the 30(b)(6) matters listed in the notices was "the mistakenly arrested or detained persons referenced" in the article. *See id.* at 5-6 ¶ 4. Thus, even if Plaintiffs had a duty to re-disclose to Denver the victims of mistaken identity arrest and detention whom *Denver already had disclosed publicly to the Denver Post*, Plaintiffs did so "in writing" and "during the discovery process," Fed. R. Civ. P. 26(e)(1)(A).

On June 18, 2009, Denver produced a PIIQ document admitting that Mr. Carlos was the victim of a mistaken identity arrest and detention by Denver. EXHIBIT 29.

On September 9 and December 4, 2009, Mr. Pendergrass in a letter to Denver's counsel identified Mr. Carlos as a person who was subject to a PIIQ investigation that determined he was the victim of a mistaken identity arrest and/or detention by Denver. EXHIBIT 12, at 14; EXHIBIT 20, at 12. On that date, Plaintiffs also produced 28 pages of documents relating to Mr. Carlos.[20] One of the documents produced was a May 2, 2009, letter from Ms. Dulacki to Mr. Carlos stating that Denver had determined that in February 2009 he was the victim of a mistaken identity arrest and/or detention. *See* EXHIBIT 22.

**Carlos Alberto Hernandez** was identified by name and specific information, e.g., birthdate, in Plaintiffs' Sixth Set of Discovery Requests. The discovery requests were served on Denver in February 2009. Request for Production No. 17 said Mr. Hernandez was one of a number of victims of mistaken identity arrest and detention by Denver. EXHIBIT 11, at 9-10. The request for production provided Mr. Hernandez's full name, birthdate, Social Security number, SID number, the approximate inclusive dates of arrest/incarceration, and the name of the suspect with whom Denver police had confused Mr. Hernandez. *Id.* at 10.

---

[20]The documents include Mr. Carlos's driver license, Denver police arrest records, jail records, court documents, mugshots of the suspect and Mr. Carlos, fingerprint images, the *Denver Post* article, and a January 2009 letter from the Department of Safety to Mr. Carlos informing him that the Department had received his report of identity theft.

Accordingly, Plaintiffs disclosed Mr. Hernandez to Denver "in writing" and "during the discovery process," Fed. R. Civ. P. 26(e)(1)(A).

On April 21, 2009, Denver responded to Request for Production No. 17. *See, e.g.,* EXHIBIT 10. In its response, Denver acknowledged that Mr. Hernandez had been arrested, and confirmed his birthdate and the identification number assigned to him by Denver Police Department. *See id.*

On June 23, 2009, and September 9, 2009, Plaintiffs produced more than 60 pages of documents relating to Mr. Hernandez.[21]

On August 14, 2009, Mr. Pendergrass in a letter to Denver's counsel identified Mr. Hernandez as a person believed to be the victim of mistaken identity arrest and detention by Denver, and requested the Denver County Court records relating to him. *See* EXHIBIT 21, at 8 & Appx.A, at 1.

On September 9, 2009, Mr. Pendergrass in a letter to Denver's counsel again identified Mr. Hernandez as a person believed to be the victim of two mistaken identity arrests and detentions by Denver, and again requested Denver records relating to him. *See* EXHIBIT 12, at 10, 11.

---

[21]The documents included docket sheets, mugshots, court documents, police records, and NCIC/CCIC documents.

On December 4, 2009, Mr. Pendergrass in a letter to Denver's counsel again identified Mr. Hernandez as a person believed to be the victim of two mistaken identity arrests and detentions by Denver, and again requested Denver records relating to him. *See* EXHIBIT 20, at 9-10.

**Joseph Ronald Walker** was identified, and information about his identity was provided, in Plaintiffs' Sixth Set of Discovery Requests. As noted, these discovery requests were served on Denver on in February 2009. Request for Production No. 17 said Mr. Walker was one of a number of victims of mistaken identity arrest and detention by Denver. EXHIBIT 11, at 9-10. The request for production provided Mr. Walker's full name, birthdate, Social Security number, District Attorney ID number, the approximate inclusive dates of arrest/incarceration, and the name of the suspect whom Denver police were trying to arrest. *Id.* Accordingly, Plaintiffs disclosed Mr. Walker to Denver "in writing" and "during the discovery process," Fed. R. Civ. P. 26(e)(1)(A).

As with Mr. Hernandez, on April 21, 2009, Denver responded to Request for Production No. 17. *See, e.g.,* EXHIBIT 10. Denver acknowledged Mr. Walker had been arrested, and confirmed his birthdate and the identification number assigned to him by Denver Police Department. *See id.*

On September 9, 2009, Plaintiffs produced documents relating to him (Walker, J. 001-015).[22]

Also on September 9, Mr. Pendergrass in a letter to Denver's counsel identified Mr. Walker as a person believed to be the victim of a mistaken identity arrest and detention by Denver, and requested Denver records relating to him. *See* EXHIBIT 12, at 10, 11.

On December 4, 2009, Mr. Pendergrass in a letter to Denver's counsel again identified Mr. Walker as a person believed to be the victim of mistaken identity arrest and/or detention by Denver, and again requested Denver records relating to him. *See* EXHIBIT 20, at 3.

**Scott Alan Jackson**'s name was first disclosed by Denver in Denver Search Results ##1 and 2. *See* EXHIBIT 15, at Fourhorn General 003207 (minute order for Case No. 01M06974, June 20, 2004); Doc.458-21, at Fourhorn General 004483 (same).[23]

---

[22]The documents included a January 21, 2009, letter from Mr. Walker responding to a January 4, 2009, *Denver Post* article discussing Denver's mistaken arrest and/or detention of innocent persons. In the letter, Mr. Walker stated, "I was also falsely arrested by the Denver Police Department." In addition to the letter, Mr. Walker provided additional information about his mistaken identity arrest and detention. *See* EXHIBIT 22.

[23]The same document was redacted by Plaintiffs and reproduced to Denver in fall 2009 as DCC0001-23 and DCC0026-47, which are referenced in Plaintiffs' response to the motion to strike. Doc.483 at 13.

On September 29, 2009, and January 19, 2010, Mr. Pendergrass in letters to Denver's counsel identified Mr. Jackson as a person believed to be the victim of a mistaken identity arrest and detention by Denver, and requested Denver records relating to him. *See* Exhibit 13, Attach., No. 91; Exhibit 24, at 2.

In February and March 2010, Denver produced numerous documents relating to Mr. Jackson's arrest. *See, e.g.,* Doc.456-11 at Fourhorn General 005004, 006724, 010674-75.

●●●

Plaintiffs obtained affidavits from each of the foregoing victims of mistaken identity arrest and detention by Denver, i.e., Messrs. Carlos, Hernandez, Walker and Jackson. The Magistrate Judge ruled they were untimely disclosed. Doc.487 at 8.

To the extent these four individuals were properly disclosed or "otherwise . . . made known during to [Denver] during the discovery process," their affidavits were not subject to Rule 26's disclosure requirements. *See Intel Corp. v. VIA Technols., Inc.,* 204 F.R.D. 450, 451 (N.D. Calif. 2001).

Nonetheless, counsel acknowledge it was only through their inadvertence that the affidavits were not disclosed before November 2011. Mr. Pendergrass obtained the four affidavits in February and March 2010—well after discovery cut-off—and placed them in a file at the ACLU office. Mr. Pendergrass left the

litigation team in July 2010. Plaintiffs' counsel Mark Silverstein was aware

generally that Mr. Pendergrass had obtained a few affidavits but was unaware that

this information had not been communicated to Mr. Gee's office, which was

principally tasked with making disclosures to the defendants. Mr. Gee did not

know of the existence of the affidavits until Mr. Pendergrass's successor, Rebecca

T. Wallace, in October 2011 located the file folder containing the affidavits and

emailed three to him on October 21, 2011, and the fourth on October 27, 2011.[24]

They were disclosed *via* email to Denver on November 7, 2011.

### C.  The remaining individuals identified by name in the Fourth Supplemental Disclosures were properly disclosed.

#### 1.  Specific Denver current or former officials, employees or agents.

The Fourth Supplemental Disclosures identified eight such individuals by

name: Shannon Clementi (¶ A.24); Ed Russell Harris (¶ A.39); E.H. Knoche

(¶ A.52); Leslie Lendt (¶ A.55); Leslie Lynch (¶ A.59); Lt. Jeannette Miller

(¶ A.65); Richard Rosenthal (¶ A.90); Ruth Tafoya (¶ A.99).

---

[24]Plaintiffs' counsel were largely inactive on this case during the period between the Court's August 2010 order dismissing Denver's summary judgment motions and the period just before Denver's re-filing of its summary judgment motion in September 2011. After Denver re-filed its motion, Ms. Wallace joined the litigation team to work on Plaintiffs' summary judgment response.

Denver withdrew its objection to Mr. Rosenthal and Ms. Tafoya. Doc.487 at 8 n.1. As to the remaining individuals, the Magistrate Judge ruled they were untimely disclosed. The ruling was error.

Denver made no effort to distinguish among the first 108 specifically identified individuals in the Fourth Supplemental Disclosures, even though these eight Denver officials and employees are among the first 108 named individuals. Instead, Denver lumped all these Denver officials and employees with the named individuals listed as victims of mistaken identity arrest and detention. In its motion (and reply), Denver made no effort to explain why the disclosures of these Denver officials and employees were untimely.

The Magistrate Judge made the same mistakes Denver did. The Magistrate Judge made no attempt to explain why Plaintiffs' disclosure of these individuals was untimely. The Order suggests that, like Denver, the Magistrate Judge included all these individuals in the category of victims of mistaken identity arrest and detention complained about in Denver's reply. *See* Doc.487 at 3 (referring apparently to the first 108 individuals identified by name in Fourth Supplemental Disclosures without distinguishing among them).

Denver presented no argument (or evidence) establishing that the disclosure of any of these Denver officials and agents was untimely. Accordingly, the motion to strike should be summarily denied as to them.

### 2.   All individuals who were deposed.

Paragraph A.110 discloses "[a]ll individuals who were deposed." Doc.447 at 15.

Neither Denver nor the Magistrate Judge discusses the timeliness of this disclosure. Rule 26(e)(1)(A) and the Rule 26 Notes on Advisory Committee on Rules make clear that it was unnecessary for Plaintiffs to disclose deponents, since deponents by definition are "made known to the other parties during the discovery process," Fed. R. Civ. P. 26(e)(1)(A), even if they were not previously disclosed. In this case, many of the deponents were disclosed by the parties before their deposition. Plaintiffs made use of numerous depositions in the various summary judgment proceedings, including the pending one. *See, e.g.,* Doc.460-61, Exs.38-64.

Denver presented no argument (or evidence) establishing that the disclosure of the deponents was untimely. Nonetheless, the Order bars Plaintiffs from using the deponents and the transcripts of their depositions at any time for any purpose in this litigation. *See* Doc.487 at 8. This was error.

### 3.  Denver law enforcement officers who participated in Plaintiffs' arrest and detention.

Paragraph A.111 discloses a category of individuals: Denver law enforcement officers who investigated, arrested or detained any of the original plaintiffs and intervenor in this action. Doc.447 at 15.

Again, neither Denver nor the Order discusses the timeliness of this disclosure. The disclosure of most such individuals was unnecessary, since many have been deposed, identified in depositions, or otherwise disclosed to the parties. This is clear from the papers filed in individual defendant-officers' summary judgment motions. Plaintiffs made use of numerous statements by and depositions of arresting and detaining officers in the various summary judgment proceedings, including the pending one. *See, e.g.,* Doc.460-61, Exs.39, 42, 47, 49, 50, 51, 57, 61.

Denver presented no argument (or evidence) establishing that the disclosure of the officers was untimely. Indeed, many of the Denver law enforcement officers who participated in Plaintiffs' arrest and/or detention had been deposed—with all sides present. A deposition of course is part of the "discovery process," Fed. R. Civ. P. 26(e)(1)(A). Nonetheless, the Order bars Plaintiffs from using the officers, their statements or the transcripts of their depositions at any time for any purpose in this litigation. *See* Doc.487 at 8. This was error.

### 4.   Individuals identified in depositions.

Paragraph A.112 disclosed all individuals identified in depositions taken  in this case. Doc.447 at 15.

Neither Denver nor the Order discusses the timeliness of this disclosure. Rule 26(e)(1)(A) and the advisory committee notes make clear that it was unnecessary for Plaintiffs to disclose these individuals, since individuals with knowledge of relevant information identified in depositions by definition are "made known to the other parties during the discovery process," Fed. R. Civ. P. 26(e)(1)(A).

Denver presented no argument (or evidence) establishing that the disclosure of these individuals was untimely. Nonetheless, the Order bars Plaintiffs from calling these individuals as witnesses or from using their testimony at any time for any purpose in this litigation. See Doc.487 at 8. This was error.

## III.   The Magistrate Judge erred in imposing drastic sanctions that effectively terminate this litigation.

Even if Plaintiffs' Fourth Supplemental Disclosures were untimely—and they were not—the imposition of sanctions constitutes serious error.

Rule 37(c)(1) authorizes sanctions to be imposed against a party for failure to comply with its disclosure obligations. Sanctions under Rule 37(c)(1) should not be imposed where the failure to disclose was substantially justified or harmless.

*Sender*, 225 F.R.D. at 656. A failure to disclose is substantially justified when the non-moving party has a reasonable basis in law and fact, and there exists a genuine dispute concerning compliance. *Id.* A failure to disclose is harmless when the movant suffers no prejudice. *Id.* The following factors guide the trial court's determination of these issues: (1) the prejudice or surprise to the party against whom the testimony is offered; (2) the ability of the party to cure the prejudice; (3) the extent to which introducing such testimony would disrupt the trial; and (4) the moving party's bad faith or willfulness. *Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co.*, 170 F.3d 985, 993 (10th Cir. 1999).

The Tenth Circuit has made it clear that imposing a sanction that terminates a lawsuit is a "particularly drastic penalty," *Ocelot Oil Corp.*, 847 F.2d at 1465, and to be imposed only in extraordinary circumstances. "Only when the aggravating factors outweigh the judicial system's strong predisposition to resolve cases on the merits . . . is dismissal an appropriate sanction." *Id.*

Courts in this Circuit have held that exclusion of evidence is itself a "drastic"[25] and "'severe sanction because it implicates due process concerns,'" *Asia Strategic Inv. Alliances, Ltd. v. General Elec. Cap. Servs.*, 1997 WL 122568, at *6 (D. Kan. Mar. 11, 1997) (quoting *In re Indep. Serv. Organizations Antitrust*

---

[25]*Summers v. Missouri Pac. R.R. Sys.*, 132 F.3d 599, 604 (10th Cir. 1997).

*Litig.*, 168 F.R.D. 651, 653 (D. Kan. 1996)). Accordingly, "[c]ourts will not

generally impose such a drastic remedy, unless the failure to disclose or

supplement is in bad faith or callous disregard of the discovery rules." *Id.* (citing

*Tritchler v. Consolidation Coal Co.*, 1996 WL 379706, at *2 (4th Cir. 1996));

*accord Goeken v. Wal-Mart Stores,* 2002 WL 1334855, at *6 (D. Kan. May 16,

2002). Exclusion of evidence is often inappropriate, furthermore, unless the

untimely disclosure occurs when trial is "imminent or in progress." *Asia Strategic*

*Inv. Alliances*, 1997 WL 122568, at *6 (quoting *In re TMI Litig. Cases Consol. II*,

922 F. Supp. 997, 1003-04 (M.D. Pa. 1996)).

### A. To the extent Plaintiffs failed to timely disclose any individual, the failure was substantially justified.

Under the Rule 26(a)(1)(A)(i) and (e) regime, every one of the 100 named

victims of mistaken identity arrest and detention had been disclosed by and to the

parties. In September and October 2009, Denver disclosed 95 (*via* search results

and PIIQ forms) of the individuals in its response to targeted discovery requests

and this Court's order compelling discovery. During the period September 2009-

February 2010, Plaintiffs re-disclosed the vast majority of these individuals to

Denver. As to the remaining three individuals, Plaintiffs disclosed those persons to

Denver by February 2009 and repeatedly re-disclosed them to Denver during the

period February 2009-December 2009. All the disclosures occurred "during the

discovery process" and "in writing," Fed. R. Civ. P. 26(e)(1)(A). Even though

Plaintiffs re-disclosed the individuals again in November 2011, they had no duty to

do so, for the reasons discussed above. *See* This Objection, § II.A. The imposition

of sanctions under these circumstances is improper. *See* Fed. R. Civ. P. 37

Advisory Committee Notes–1993 Amendment ("Limiting the automatic sanction

to violations 'without substantial justification,' coupled with the exception for

violations that are 'harmless,' is needed to avoid unduly harsh penalties in a variety

of situations: e.g., the inadvertent omission from a Rule 26(a)(1)(A) disclosure of

the name of a potential witness known to all parties . . . .").

**B.  To the extent Plaintiffs failed to timely disclose any individual, it was harmless.**

**1.  Denver suffered no prejudice or surprise.**

In its motion to strike, Denver made only the most generalized argument

about prejudice, staing: Disclosure of "one hundred witnesses plus extra

documents in the midst of summary judgment briefing is a considerable addition to

the case and by its magnitude prejudicial"; and the delay in supplementing was

"lengthy." Doc.451 at 3. Denver also suggested that the Fourth Supplemental

Disclosures caused "mounting attorneys fees." *Id.*

In its reply, Denver argued for the first time that its prejudice was Plaintiffs'

"heavy reliance" on "[a]t least 87" of the individuals listed in the Fourth

Supplemental Disclosures. Doc.486 at 3. Plaintiffs "heavily relied" on the

individuals, Denver argued, by "mention[ing]," "nam[ing]" or "referenc[ing]"

them in Plaintiffs' summary judgment response. *Id.* Denver repeated its argument

that disclosing "100 witnesses in the middle of summary judgment briefing" was

*per se* prejudicial, and that "delay and mounting attorneys fees can equate to

prejudice." *Id.*

The Order went much further than any arguments made by Denver. It found

that Denver had suffered prejudice for these reasons: (a) Denver did not have "the

opportunity to investigate the evidence related to the witnesses" identified in the

Fourth Supplemental Disclosures and "relied on by Plaintiffs"; (b) the timing of

the disclosures "is akin to trial by ambush, only on paper"; (c) Denver "simply did

not get a chance to determine how to utilize its allotted discovery . . . due to the

delay"; and (d) there was both "delay and mounting attorneys fees." Doc.487 at 5-

6. In short, the Magistrate Judge determined, Denver "is indeed prejudiced, in

terms of time, money, and effort" by the disclosures. *Id.* at 6.

All of Denver's alleged prejudice is premised on Denver's (and the

Magistrate Judge's) factual errors. As discussed in Section II.A. of this Objection,

every one of the 100 named victims of mistaken identity arrest and detention had

been timely disclosed and/or re-disclosed repeatedly either by Denver or Plaintiffs,

or both. The vast majority of individuals was not known to Plaintiffs until Denver

disclosed the Denver Search Results #1 in late September 2009, well after

discovery cut-off. In letters sent directly to Denver's counsel, Plaintiffs' counsel

named and referenced the vast majority of these individuals *specifically*,

sometimes repeatedly, during the period September 2009-February 2010.

Notwithstanding the disclosure of 100 named victims, Plaintiffs made testimonial

use of only four, each of whom had previously been disclosed in 2009 (two were

disclosed in February 2009).[26]

Denver suffered no surprise, let alone any prejudice, from the re-disclosure

of the 100 names in November 2011. *See Fleet Cap. Corp. v. Yamaha Motor*

*Corp.*, 2002 U.S. Dist. Lexis 17502, at *6 (S.D.N.Y. Sept. 19, 2002) ("'a failure to

disclose witness information is "harmless" if the other party was well aware of the

identity of the undisclosed witness and the scope of their knowledge well before

trial'") (quoting 6 *Moore's Federal Practice* § 26.27[2][d], at 26-93).

The only documents listed in Plaintiffs' Fourth Supplemental Disclosures

and at issue in this Objection are the four affidavits. They were not disclosed

---

[26]In the face of these facts, the Order is simply wrong to say that the timing of the disclosures and Plaintiffs' "significant reliance on evidence" from the "witnesses" was "akin to trial by ambush, only on paper," Doc.487 at 6. Since all 100 victims had been disclosed by February 2010—Denver itself disclosed 95 through its search results and PIIQ forms—there could have been no "ambush" in November 2011.

because of Plaintiffs' counsel's inadvertence. Nonetheless, so long as the affiants were timely disclosed, their affidavits need not be. *See Intel Corp. v. VIA Technols., Inc.,* 204 F.R.D. 450, 451 (N.D. Calif. 2001). Here, each of the affiants was timely disclosed. *See* This Objection, at 51-57. Importantly, Plaintiffs obtained the affidavits from these individuals *5-8 months after discovery had closed*. Thus, even if Plaintiffs had disclosed the affidavits immediately after they were executed, Denver would be in the same position it is in now, and the same position Plaintiffs were in—required to use informal methods for obtaining information and testimony for summary-judgment purposes.

The Order adopts Denver's argument—presented for the first time in its reply in support of its motion to strike—that Denver suffered prejudice because prior to serving the Fourth Supplemental Disclosures, "Plaintiffs had substantial knowledge of the City's summary judgment arguments through the City's prior summary judgment motions," Doc.486 at 2. The Order states, "Despite this insight [into Denver's "defense strategy"], Plaintiffs waited to submit their . . . Disclosures until [Denver's] renewed motion for summary judgment." Doc.487 at 5.

If Plaintiffs had been afforded an opportunity to respond to Denver's new argument, we would have made the following points. One, it is misleading for Denver to argue that there was some "strategic" advantage in the timing of the

Fourth Supplemental Disclosures. Based on its own disclosures of victims and from the disclosures and re-disclosures made by Plaintiffs *before* Denver had filed any summary judgment motions, Denver *knew* the identities of all 100 victims named in the disclosures at the time it filed its motions or shortly afterward. Two, to the extent Denver was claiming Plaintiffs owed some duty to Denver to marshal the evidence of mistaken-identity victims within some specific time period after Denver's summary judgment motions were filed, that is not the law. *See* This Objection, at 39 n.15.

### 2.   Denver has suffered no prejudice requiring curing.

The second *Sender* factor is irrelevant here, because Denver suffered no prejudice. To the extent the Order concludes otherwise, it is error. Denver itself generated the very two documents identifying (or leading to the identification of) 97 of the 100 victims of mistaken identity arrest and detention identified by name in the Fourth Supplemental Disclosures. And it generated the two documents in response to specific discovery requests that this Court compelled it to answer. Denver knew the significance of every such victim—information about these victims' mistaken identity arrest and detention by Denver supported a key theory of *Monell* liability alleged by Plaintiffs in their pleadings. Immediately afterward, Plaintiffs then proceeded to re-disclose to Denver—"during the discovery process"

and "in writing," Fed. R. Civ. P. 26(e)(1)(A)—83 of the 97 named victims who appear in the contested disclosures.

### 3. The victims' testimony will disrupt neither the summary judgment proceedings nor trial.

In its motion to strike, Denver argued that the sheer number of individuals disclosed, "combined with the timing and delay of the Disclosures, does disrupt the case briefing." Doc.451 at 3. Denver did not explain how. *See id.*

In its reply, Denver repeated the argument. *See* Doc.486 at 4. For the first time, Denver then attempted to explain how the sheer number of disclosed victims of mistaken identity arrest and detention, combined with the "timing and delay," "disrupted" the summary judgment proceedings. *Id.* at 3. Denver suggested— misleadingly—that Plaintiffs had "relied . . . directly" upon testimony from each of "[a]t least 87 of the witnesses" listed in the Fourth Supplemental Disclosures. *Id.* "The untimely disclosures are in no way harmless, when they are so heavily relied upon," Denver argued. *Id.*

Also for the first time, Denver urged that to level the playing field, the Court had only two choices: exclude the evidence, or impose equally drastic sanctions: suspend summary judgment briefing for some two years, re-open discovery during that period, permit only Denver to "investigate and depose" the "*newly* disclosed witnesses," permit only Denver to propound written discovery requests regarding

the "*new* witnesses and documents," and require Plaintiffs to pay all attorney fees and costs incurred for all Denver's discovery during the two-year period. *Id.* at 6 (emphasis supplied).

Denver did not explain how our November 2011 re-disclosure of the victims of mistaken identity arrest and detention would disrupt the trial of this matter.

Without affording Plaintiffs an opportunity to address these new issues and arguments presented by Denver, the Magistrate Judge determined that the Fourth Supplemental Disclosures would cause an "obvious disruption to the [summary judgment] briefing." Doc.487 at 7. To re-open discovery and prolong adjudication of Denver's summary judgment motion would "reward[]" Plaintiffs, the Magistrate Judge ruled. *Id.* Finally, the Magistrate Judge ruled that although no trial is set, "the disruption to the adjudication of the pending motion for summary judgment is sufficiently meaningful that these two factors[27] weigh in favor of excluding the Fourth Supplemental Disclosures." *Id.*

The *Woodworker's* factor is "the extent to which introducing [a late-disclosed individual's] *testimony* would disrupt the trial," 170 F.3d at 993 (emphasis supplied). Except for four affidavits, however, Plaintiffs' summary

---

[27]Plaintiffs do not know what "two factors" the Magistrate Judge was referring to.

judgment response made no *testimonial* use of any of the of the 100 named victims of mistaken identity arrest and detention by Denver.

As discussed in Sections I.A. and II.A. of This Objection, Denver implied, and the Order tacitly accepts Denver's erroneous implication, that Plaintiffs had "relied upon" the *testimony* of "87 witnesses." That is incorrect. Plaintiffs used the testimony of only four individuals identified by name in the Fourth Supplemental Disclosures: Luiz Manuel Carlos, Carlos Alberto Hernandez, Joseph Ronald Walker, and Scott Alan Jackson. As discussed above at pages 51-57, each one of these affiants was timely disclosed years ago. As to *every other victim of mistaken identity arrest and detention identified by name in the contested disclosures,* Plaintiffs' summary judgment response relied solely on previously-disclosed documents that were not subject to Denver's motion to strike. In almost all cases, those documents were previously produced by Denver in discovery, and they establish that each of the individuals had been arrested and/or detained based on mistaken identity.

Nor was the re-disclosure in November 2011 of the remaining 96 individuals named in the Fourth Supplemental Disclosures disruptive of the summary judgment proceeding. The parties had disclosed and re-disclosed those individuals

during the discovery process and in writing from September 2009 until February 2010.

The Order's implicit determination that the timing of the Fourth Supplemental Disclosures would disrupt a trial that has not been set is erroneous. The vast majority of the individuals named in the disclosures was first made known to the parties in September and October 2009, well after discovery cut-off and pursuant to a court order. Their re-disclosure in November 2011 could not have any impact on a trial that has not been set. The Order does not explain how the disclosure of any of the individuals identified in the Fourth Supplemental Disclosures would disrupt a trial.

### 4.  The Magistrate Judge erred in finding "bad faith" by Plaintiffs.

Denver did not argue in its motion to strike or reply that Plaintiffs engaged in bad faith. It certainly offered no evidence of bad faith.

In determining nonetheless that Plaintiffs had engaged in "bad faith," the Magistrate Judge made these erroneous findings: (a) Plaintiffs' argument that Denver already was aware of the "108 witnesses" prior to November 2011 is "flawed"; (b) Plaintiffs did not carry their burden to justify the "late submission" of the Fourth Supplemental Disclosures; and (c) Plaintiffs' "excuse" of "press of business" is not good cause for delay. Doc.487 at 3, 7. After making these findings,

the Court stated that it was "left to conclude that Plaintiffs acted willfully in delaying submission of their Fourth Supplemental Disclosures." *Id.*at 7.

The findings are clearly erroneous and wholly lacking in a factual basis. A review of Plaintiffs' counsel's *eight* conferral letters to Denver painstakingly detailing the evidence we had uncovered in Denver's own documents of mistaken identity arrests and detentions, and explaining how such evidence supported Plaintiffs' *Monell* theory is more than sufficient to dispel any notion of bad faith on Plaintiffs' part.

As discussed, the facts establish not only that Denver was aware of the 100 named victims of mistaken identity arrest and detention prior to November 2011, but also it had disclosed 95 of them to Plaintiffs in a context that unambiguously established that these individuals likely had information about mistaken identity arrests/detentions. Thereafter, Plaintiffs re-disclosed the vast majority of them to Denver. All this occurred between September 2009 and February 2010. The remaining three were disclosed by Plaintiffs to Denver well before discovery cut-off. None of the non-victims of mistaken identity arrest and detention, e.g., Richard Rosenthal, was used in any way in the summary judgment response, with the exception of those who had been deposed. For these reasons, the first and second findings are incorrect: Prior to November 2011, Denver in fact knew of all 100 of

the victims named in the Fourth Supplemental Disclosures. The Fourth Supplemental Disclosures, effectively *re*-disclosures—was not a "late submission" as a matter of law.

The third finding also is incorrect. Reacting to Plaintiffs' response to the motion to strike, the Magistrate Judge mischaracterized Plaintiffs' argument as a request to accept as an "excuse" for the November 2011-filed Fourth Supplemental Disclosures the "press of business, and apparently, litigation strategy." Doc.487 at 3. In finding "bad faith," the Magistrate Judge again characterized the delay as one that Plaintiffs had tried to justify by "the press of business." *Id.* at 7. In fact, Plaintiffs at no time claimed that the timing of the Fourth Supplemental Disclosures was the result of "the press of business." Nor is there any evidence that Plaintiffs served the disclosures in November 2011, rather than earlier, because of "litigation strategy."

In the response to the motion to strike, Plaintiffs provided a detailed procedural history of this case, in part out of concern that the Magistrate Judge was not as familiar with the history as the District Judge, and in part because the procedural history accurately explains why the Fourth Supplemental Disclosures was filed in November 2011. *See* Doc.483 at 2-9.

To summarize: Until September 2009, after discovery cut-off, the vast majority of the 100 named victims of mistaken identity arrest and detention identified in the Fourth Supplemental Disclosures was unknown to the parties. Thereafter, they were timely disclosed and re-disclosed between the parties from September 2009 through February 2010. From December 2009 through August 2010, Plaintiffs continued to await *Monell*-related discovery from Denver. From August 2010 until August 2011, none of the parties engaged in *Monell*-related litigation. Meanwhile, by August 2010, Plaintiffs' litigation team had lost two key members who had been working on supporting Plaintiffs' *Monell* legal theories. One of the departing members, Mr. Pendergrass, had accumulated a significant amount of knowledge about the *Monell* evidence that none of the other litigation members had or could easily acquire; undersigned counsel, lead counsel for Plaintiffs, was on sabbatical from June 2011 until September 7, 2011. Plaintiffs' current team, constituted in September 2011, began work on responding to Denver summary judgment motion shortly after it was filed on September 15, 2011.

After Denver filed the summary judgment motion, Ms. Wallace was tasked with marshaling the evidence relating to Denver's custom of carrying out mistaken identity arrests and detentions. Unfamiliar with the history of discovery in this action and the disclosures and re-disclosures of victims of mistaken identity arrest

and detention, Ms. Wallace compiled a list of victims of such arrests and detention and emailed the list to undersigned counsel on November 7, 2011. Undersigned counsel caused those victims on the list to be placed in the Fourth Supplemental Disclosures, which was served on Denver the next day, November 8.

Our recitation of the procedural history was not a claim of "press of business." It was, however, a refutation of the notion that the timing of the Fourth Supplemental Disclosures was the product of "bad faith" or "litigation strategy."

## Conclusion

For the foregoing reasons, this Court should sustain the objection to the Magistrate Judge's Order, vacate the Order, and deny Denver's motion to strike.

Dated: March 5, 2012.

Respectfully submitted,

| s/ Ty Gee | s/ Mark Silverstein |
|---|---|
| Ty Gee | Mark Silverstein |
| HADDON, MORGAN AND FOREMAN, P.C. | Rebecca Teitelbaum Wallace |
| 150 East Tenth Avenue | AMERICAN CIVIL LIBERTIES UNION |
| Denver, CO 80203 | FOUNDATION OF COLORADO |
| 303.831.7364 | 400 Corona Street |
| *In cooperation with the American Civil Liberties Union Foundation of Colorado* | Denver, CO 80218 |
| | 303.777.5482 |

*Attorneys for Plaintiffs and Plaintiff-Intervenor*

**Certificate of Service:** I certify that on March 5, 2012, I electronically filed the foregoing *Plaintiffs and Intervenors' Objection to Magistrate Judge's Ruling on Denver's Motion to Strike Witnesses and Documents* with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following email addresses:

Stuart L. Shapiro: stuart.shapiro@ci.denver.co.us

s/ Angela Duran
Angela Duran